UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
KEY WEST DIVISION

| | |
|---|---|
| Peter Sean Brown, <br><br> Plaintiff, <br><br> v. <br><br> Richard A. Ramsay, in his official capacity as Sheriff of Monroe County, <br><br> Defendant. | Case No. 18-cv-_____ <br><br> JURY TRIAL DEMANDED |

**COMPLAINT**

## INTRODUCTION

1. This action challenges the unlawful arrest and detention of U.S. citizen Peter Sean Brown by the Monroe County Sheriff's Office ("Sheriff's Office" or "Sheriff").

2. The Sheriff's Office arrested Mr. Brown pursuant to its policy and practice of carelessly and aggressively arresting people for Immigration and Customs Enforcement ("ICE"), under a Basic Ordering Agreement ("BOA") between the two agencies. The BOA scheme, which provides the Sheriff with $50 per arrest, is an attempt to put a new gloss on local arrests for ICE. But the BOA changes nothing about the unlawfulness of the arrest in this case.

3. Mr. Brown is a U.S. citizen, born in Philadelphia, who lives in the Florida Keys. In April 2018, the Sheriff's Office illegally detained him in response to a request from ICE. Throughout his detention, Mr. Brown repeatedly told the Sheriff's officers that he was a U.S. citizen and could not be deported or held for ICE. He offered to produce his birth certificate. His friend and co-worker called the jail on his behalf to explain his citizenship. He filed multiple written grievances explaining that he was born in the United States. The Sheriff's own jail file showed that he was a U.S. citizen born in Philadelphia and had a valid Florida driver's license.

4. Despite his repeated protests to multiple jail officers, his offer to produce proof, and the jail's own records, the Sheriff's Office held Mr. Brown so that ICE could deport him to Jamaica—a country where he has never lived and knows no one. The Sheriff's Office ignored all the indications that it was illegally detaining Mr. Brown. It did nothing to investigate his citizenship. It did not contact ICE to pass along this urgent information, or ask for a review of Mr. Brown's files. It did not seek any further information from Mr. Brown or anyone else. It simply held Mr. Brown, in violation of his constitutional rights and after he was entitled to release under state law, so that he could be picked up by ICE and deported from the country

where he was born and has lived his entire life. If not for the last-minute intervention of a friend who sent a copy of his birth certificate to an ICE agent, Mr. Brown would have been illegally deported because of the Sheriff's actions.

5. The Sheriff's Office held Mr. Brown because of a detention request from ICE known as a "detainer." A detainer asks a state or local agency, like the Sheriff's Office, to hold an individual for up to 48 hours after there is no longer any basis to hold the person under state law—whether because the person posts bond, completes his sentence, or otherwise resolves his state charges. The detainer request is conveyed through a check-box form that ICE fills out remotely and faxes to the Sheriff.

6. Holding an individual for a new purpose, after he should otherwise be released, constitutes a new arrest. Yet the Sheriff's Office has no policies or training in place to address information that arises after it receives a detainer request, and therefore does nothing to ensure that it has probable cause to hold each individual who is subject to such a request. Instead, the Sheriff's Office's policy and practice is to effectuate every detainer request it receives from ICE, no matter what other information about the person it may receive. But law enforcement officers cannot ignore evidence that negates probable cause, nor can they refuse to obtain easily discoverable facts that would exculpate the subject of an arrest. The Sheriff's policy and practice of automatically executing ICE's arrest instructions ensured that the Sheriff would violate people's Fourth Amendment rights.

7. The Sheriff cemented this policy when he adopted a BOA with ICE and announced his intention to aggressively carry out ICE's detention requests. The $50 payment the Sheriff's Office receives under the BOA does not excuse the Sheriff from complying with the Constitution, and it does not change the legal consequences of his illegal arrest of Mr. Brown.

3

Multiple district and appellate courts have held that local law enforcement agencies that effectuate detainers are subject to liability for the constitutional violations that result.

8. Mr. Brown brings this lawsuit to vindicate his Fourth Amendment rights and his right to be free from false imprisonment under Florida law. Nobody should have to endure what he endured. He was kept in jail—away from his family, friends, and work—solely to facilitate his illegal deportation from the United States. The Sheriff's Office ignored his pleas for weeks, mocked him, and led him to believe that he would soon find himself in a Jamaican prison. He suffered severe anxiety, fear, and trauma in the process. He was unable to find work for two weeks as a result. And he has continued to suffer serious emotional consequences since this ordeal ended. These negative outcomes are all the direct result of the Sheriff's Office's blatant disregard for Mr. Brown's constitutional rights and its policy and practice of thoughtlessly effectuating ICE's detainer requests despite evidence undermining their basis.

## JURISDICTION AND VENUE

9. This Court has jurisdiction under 28 U.S.C. §§ 1331, 1343.

10. The Court has supplemental jurisdiction over Mr. Brown's state law claim under 28 U.S.C. § 1367 because the state law claim is part of the same case or controversy.

11. The Court has remedial authority under 42 U.S.C. § 1983 and 28 U.S.C. § 2201.

12. Venue is proper in the Southern District of Florida because the Defendant resides in this District and a substantial portion of the events giving rise to the claims occurred in this District. 28 U.S.C. § 1391(b)(1)-(2).

## PARTIES

13. Peter Sean Brown is a natural-born citizen of the United States who lives in Monroe County, Florida.

4

14. Richard A. "Rick" Ramsay is the Sheriff of Monroe County. He is the chief law enforcement officer and policymaker for the Monroe County Sheriff's Office, which runs the Monroe County Detention Center, and which is a municipal agency under Florida law. *Hufford v. Rodgers*, 912 F.2d 1338, 1341 (11th Cir. 1990); *see Samarco v. Neumann*, 44 F. Supp. 2d 1276, 1287 (S.D. Fla. 1999). Sheriff Ramsay is sued in his official capacity.

## BACKGROUND

**The Sheriff's Seizure of Mr. Brown for ICE**

15. Peter Sean Brown was born in Philadelphia, Pennsylvania in 1968. He grew up in New Jersey, where he lived for much of his 20s, working in restaurants and hotels. He moved to Florida about a decade ago.

16. Mr. Brown has lived in the United States his entire life. He spent one day in Jamaica during a cruise years ago, but has otherwise never been to Jamaica and does not have any connection to the country.

17. Mr. Brown currently lives in the Florida Keys, where he has worked in the restaurant industry for many years.

18. On April 5th, 2018, Mr. Brown turned himself in to the Sheriff's Office for a probation violation after he tested positive for marijuana. He expected he would be in jail at the Monroe County Detention Center only until the probation violation was resolved, and that he would then be released back to his work and community.

19. The Sheriff's Office took custody of Mr. Brown and, as part of its routine book-in procedures, it sent Mr. Brown's fingerprints to the FBI, which automatically forwarded the fingerprints to ICE (as it does with all fingerprints from jails).

20. The next day, an ICE officer faxed the jail an I-247A detainer form. The detainer requested that the jail hold Mr. Brown for up to an additional 48 hours "beyond the time when he/she would otherwise have been released." The form contained no narrative specific to Mr. Brown. It contained only a list of check boxes indicating generic bases for why a person might be removable. For Mr. Brown, boxes were checked indicating that he had a final removal order and unspecified "biometric confirmation."

21. Shortly after receiving the ICE detainer, the Sheriff's Office gave Mr. Brown a copy of the detainer form.

22. Mr. Brown was shocked and frightened to learn that he had been flagged for deportation. He immediately began telling nearly every jail employee he encountered that he was a U.S. citizen, born in Philadelphia, and that they should not be holding him for ICE.

23. At the same time, Mr. Brown's friend and manager at Fogarty's Restaurant (where he worked), Brooke Lynch, independently learned of his ICE detainer. She had heard that Mr. Brown was in jail, so she checked the Sheriff's online inmate locator.

24. The website indicated that Mr. Brown had an ICE detainer lodged against him. It also contained a number of discrepancies: It indicated that Mr. Brown was 7 feet tall when, in reality, he is 5 feet, 7 inches tall. And it listed an incorrect birthdate for Mr. Brown, which did not match the detainer form.

25. Upon learning this, Ms. Lynch called the jail and told the Sheriff's officers that Mr. Brown was a U.S. citizen, and so they could not hold him on an ICE detainer. She explained that he was born in Philadelphia, and that the jail's listed birth date for Mr. Brown was wrong. The officers simply told her she should call ICE. They did not ask Ms. Lynch for any details

about her serious claim. The officers said they would hold Mr. Brown as long as the detainer remained in effect.

26. The Sheriff's inmate file for Mr. Brown confirmed, in multiple places, that he was a U.S. citizen. The file lists his place of birth as "Philadelphia, Pennsylvania" in capital letters. This file was available to jail staff throughout Mr. Brown's detention.

27. The inmate file also shows that Mr. Brown had a valid Florida driver's license, which can only be obtained by U.S. citizens and non-citizens who have legal authorization to be in the United States. *See* Fla. Stat. § 322.051(1)(a)(3).

28. Mr. Brown verbally informed at least half a dozen employees of the Sheriff's Office that he was a U.S. citizen who could not be held on an immigration detainer. None of them investigated his claim or otherwise took steps to ensure that he would not be held on the detainer.

29. The Sheriff's officers uniformly refused to help Mr. Brown. They explained that—despite his protests—they would hold him on the ICE detainer unless ICE revoked it. They told him he could try to contact ICE, but that the Sheriff's Office would not help him, and would instead continue to hold him beyond when he would otherwise be released from custody under state law.

30. In response, Mr. Brown told multiple jail officers that he had a birth certificate at home that proved his citizenship. He offered to ask his roommate to send it to the Sheriff's Office. The officers told him not to bother, because it would not change anything. They said they would hold him on the ICE detainer no matter what, regardless of his birth certificate.

31. Once it became clear that the Sheriff was planning to hold him on the ICE detainer despite his repeated explanations that he was a U.S. citizen, Mr. Brown decided to file a formal, written complaint with the Sheriff.

32. He filed his first written complaint on April 8, 2018. His complaint explained that he was being held pursuant to "a false immigration detainer," and further stated in unequivocal terms: "I am and have always been a U.S. citizen."

33. On April 11, the Sheriff's officers responded that they would not help him. The entirety of the response read: "Sir, are you asking to go to the law lib[rary?] We can't advise you on any legal process."

34. Mr. Brown twice tried to call ICE from the jail, using the phone numbers listed on the detainer form. But he was never able to reach a live person. On one call, he was sent through an endless loop of automated messages, which never allowed him to speak to an actual person. On the other call, the phone just rang and rang, and never reached a person or even an answering machine.

35. Mr. Brown told a jail officer that he had tried calling ICE multiple times but was unable to reach anyone. The officer explained that there was nothing he could do to help Mr. Brown.

36. It is not surprising that Mr. Brown was unable to reach anyone at ICE with authority to revoke his detainer. The detainer form lists the phone number for the Law Enforcement Support Center (LESC). But the wait time for LESC calls is notoriously long, the hotline is staffed by contractors with no authority to cancel detainers, and even if a caller does manage to reach an ICE agent, it can take multiple days to track down a person's files. Inmates

often never get to that point, because many callers are placed on hold for an hour or more, and most inmates are not able to stay on the phone for that long.

37. Mr. Brown filed another written complaint with the Sheriff on April 16, 2018. He explained, "I have been wrongly accused and threatened with deportation from ICE," but "I am and have always been a citizen of the United States." His written complaint also explained that once before, 20 years ago in New Jersey, ICE's predecessor agency had mistakenly arrested him but released him after learning that he was a U.S. citizen. He explained that "[n]ow as a 50 year old man," he did not want to be "threatened with that humiliation again."

38. The jail responded on April 17, in writing, that it would hold him for ICE regardless, and that it would not take any action to confirm his citizenship claim. As Lieutenant Linares wrote, "it is not up to us to determine the validity of the ICE hold. That is between you, your attorney and ICE."

39. Mr. Brown again wrote to the Sheriff on April 19, stating, "I'm trying to obtain information concerning a[n in]valid ICE hold. I'm a US citizen. How is this even possible?" The Sheriff received the complaint the next day, on April 20, but did not respond.

40. During his time in detention, one of the officers Mr. Brown spoke with told Mr. Brown that the Sheriff recently had held another U.S. citizen for ICE. The officer explained that this other person had been held for almost a year, until it was determined that he was a U.S. citizen.

41. Mr. Brown's court date for his probation violation was scheduled for April 26. Early that morning, jail employees woke him up to take him to court. At his court hearing, the judge reinstated his probation and ordered an end to his detention on the probation violation.

42. The Sheriff's Office did not release Mr. Brown after his hearing, as the judge had ordered. Instead, it rearrested Mr. Brown and transported him back to the jail, where he remained detained on the ICE hold.

43. Mr. Brown renewed his pleas for the Sheriff to release him because he was a U.S. citizen. The Sheriff's officers mocked him. After Mr. Brown told them he was born in Philadelphia, one of the guards sang him the theme song to the 1990s TV show "Fresh Prince of Bel Air"—which references being "born and raised" in West Philadelphia. The guard then told Mr. Brown to stop "bothering" him.

44. Mr. Brown was terrified. As a gay man, he feared that he would be subject to abuse in detention once he arrived in Jamaica. *See* Human Rights Watch, *Jamaica: Unchecked Homophobic Violence*, Oct. 21, 2014.[1]

45. Mr. Brown had only been to Jamaica for one day, on a cruise years ago, and had no idea what to expect. The mocking and taunting by the Sheriff's officers made him feel powerless and afraid.

46. In a final attempt to prevent his illegal detention, on April 26—three weeks after he was first detained—Mr. Brown filed one more written complaint to inform the Sheriff that he was a U.S. citizen who could not be held on an ICE detainer. He filed a written form stating that "I am being misclassified as an illegal Jamaican immigrant. . . . I am a U.S.A. citizen born in Philadelphia, Pennsylvania."

47. By this point, every officer Mr. Brown had communicated with about his citizenship—both verbally and in writing—had told him that the Sheriff's Office would hold him

---

[1] Available at https://www.hrw.org/news/2014/10/21/jamaica-unchecked-homophobic-violence.

on the ICE detainer no matter what, even if he was a U.S. citizen. Mr. Brown ended the April 26 letter by reminding the Sheriff, "I have asked for assistance which has been futile as of yet."

48. Mr. Brown never received a response to his April 26 letter.

49. On the morning of April 27, jail officers woke Mr. Brown and told him to pack his bags. He asked where he was going, and they responded, "You'll find out when you get there."

50. Eventually, Mr. Brown learned that he was going to be taken to Krome Detention Center ("Krome"), an immigration detention facility in Miami. During the transfer procedure, he again notified jail staff that he was a U.S. citizen. He signed all documents by writing "U.S. Citizen" after his name. Jail staff again mocked him. One of them told Mr. Brown "Yeah, whatever mon, everything's gonna be alright" in a Jamaican accent.

51. Mr. Brown was then held by the Sheriff with other ICE detainees for approximately two more hours, as they waited for ICE agents to pick them up.

52. When the ICE agents arrived, they put Mr. Brown on a bus that was bound for Krome, where immigrants are typically held immediately prior to their deportation.

53. Mr. Brown and the other detainees were not given food or water on the bus. When they arrived at Krome, they were forced to wait in the parking lot for approximately two hours. One of the detainees was sick and had to use the bathroom, but was not permitted to do so. As a result, he defecated on the bus. The ICE agents left the bus because of the smell, but made Mr. Brown and the other detainees stay on the bus.

54. Once Mr. Brown was inside Krome, ICE agents showed him what they claimed was his immigration file. The picture on the file was Mr. Brown's intake photograph from the three-week detention in the Sheriff's jail from which he had just been released. He knew this

11

because in the photograph he was wearing the clothes he had been wearing on April 5, 2018, when he turned himself in to the Sheriff's Office.

55. Mr. Brown was terrified that he could be put on a plane at any moment and deported to Jamaica.

56. Mr. Brown told the ICE agents that he was a U.S. citizen. Unlike the Sheriff's Office, ICE officers agreed to look at Mr. Brown's birth certificate.

57. On the afternoon of April 27, 2018, Mr. Brown's roommate emailed Mr. Brown's birth certificate to an ICE officer at Krome.

58. After confirming that Mr. Brown was a U.S. citizen, ICE hastily arranged for his release from Krome. Before he left, they confiscated all the documents they had given him regarding his impending deportation.

59. ICE released him alone in Miami, a several-hours' drive from his home in the Keys, with no offer to arrange for his transport home.

60. The daughter of Mr. Brown's roommate eventually picked him up and drove him home.

**The Consequences of the Sheriff's Unconstitutional Detention of Mr. Brown**

61. The Sheriff's decision to hold Mr. Brown caused him to suffer serious emotional consequences. After returning home, he was severely depressed, both because of the terror he had just experienced, and because of the demeaning treatment he suffered at the hands of the Sheriff's officers. They made him fear he would be deported to a foreign country where he faced a serious threat of bodily harm. He is worried he will again be wrongfully held on an ICE detainer, and that he will again have no recourse, because the Sheriff's Office continues to hold people unquestioningly whenever it receives a detainer request.

62. Mr. Brown's illegal arrest has also had serious financial consequences. During his detention, he lost his job at Fogarty's Restaurant, which he had held for the previous two years. And because of the emotional fallout from his illegal arrest by the Sheriff's Office, he was unable to search for a new job immediately upon release. He went without work for approximately two weeks before he found a new job at a deli.

**Background on ICE Detainers**

63. An ICE detainer (sometimes called an "ICE hold" or "immigration detainer") is a request that ICE sends to a state or local jail to hold a person for up to an additional 48 hours after there is no longer a legal justification for the person's detention under state law.

64. The request is conveyed through DHS Form I-247A, which contains pre-written check boxes indicating the reason ICE believes the person is removable. An ICE detainer is faxed by a federal employee, who typically has no communication with local officers and cannot be contacted later with questions or additional information.

65. Detainers may be accompanied by other paperwork, such as an I-200 administrative warrant, which is issued by an ICE police officer and directs other ICE officers to make an arrest. *See* 8 C.F.R. §§ 287.5(e)(3), 287.8(c)(1) (providing that only certain federal officers may execute an I-200).

66. Local jails have no obligation to hold a person on an ICE detainer; the detainer is purely a request from ICE. *See Galarza v. Szalczyk*, 745 F.3d 634, 641 (3d Cir. 2014). Jails are free to decline an ICE detainer for any reason, or for no reason at all.

67. Holding a person on an ICE detainer constitutes a new seizure for Fourth Amendment purposes, and therefore requires a new probable cause justification. *See Morales v. Chadbourne*, 793 F.3d 208, 218 (1st Cir. 2015).

68. Regardless of what kind of probable cause is required for a detainer request, *see, e.g.*, *Creedle v. Miami-Dade Cty.*, No. 17-cv-22477, Dkt. 105 (S.D. Fla. Nov. 9, 2018), there is no question that officers cannot arrest a person when they lack probable cause to believe the person is removable or committed a crime. At the very least, if they learn that a person is not removable, local officers may not hold the person on an ICE detainer. *See Morales*, 793 F.3d at 215-16.

**The Unreliability of ICE Detainers**

69. Mr. Brown's ordeal is not unique. In the last several years, ICE has placed immigration detainers on hundreds, if not thousands, of U.S. citizens, even though U.S. citizens are clearly not subject to removal or immigration detention. As a result, officials like the Sheriff who consistently effectuate ICE detainer requests are constantly at risk of carrying out unconstitutional seizures.

70. The unreliability of ICE's detainer requests has been documented in study after study. For example, a recent study by the Cato Institute found that in just one Texas county, ICE issued 228 detainers against U.S. citizens from 2005 to 2017. If the proportion of detainers issued against U.S. citizens was the same across other counties, it would mean that ICE detainers have targeted approximately 3,500 U.S. citizens in Texas and at least 20,000 nationally.

71. Other studies have similarly found that ICE detainers frequently lead local law enforcement agencies to arrest people without probable cause, even of removability. A Syracuse University study found that, according to ICE's own records, ICE placed detainers on 834 U.S. citizens over just a four-year period. Over the same period, ICE placed detainers on 20,281 legal permanent residents with no recorded criminal convictions, who therefore were likely not subject to removal.

72. Studies by NPR and Northwestern University similarly found "that hundreds of American citizens each year find themselves" detained by local jails at ICE's request.

73. Individual examples of U.S. citizens held on ICE detainers are too numerous to list. *See, e.g.*, Andy East, *U.S. Citizen Jailed in Immigration Status Mistake*, TEXAS TRIBUNE (Feb. 27, 2016) (example of Ricardo Garza, U.S. citizen held for 36 days on an ICE detainer); *Creedle v. Miami-Dade Cty.*, No. 17-cv-22477, Dkt. 105 (S.D. Fla. Nov. 9, 2018) (denying motion to dismiss claim by a U.S. citizen who was held on an ICE detainer by Miami-Dade County); *Morales v. Chadbourne*, 793 F.3d 208 (1st Cir. 2015) (U.S. citizen held *twice* for ICE by state jail); *Galarza v. Szalczyk*, 745 F.3d 634 (3d Cir. 2014) (U.S. citizen held on ICE detainer); Christine Hauser, *U.S. Citizen Detained by ICE Is Awarded $55,000 Settlement*, N.Y. TIMES (Oct. 29, 2018).

**The Sheriff's Policy and Practice of Holding People on ICE Detainers**

74. Despite the clear problems with holding people on ICE detainers, the Sheriff has a policy and practice of effectuating all the detainers he receives from ICE, no matter what information he subsequently learns.

75. According to ICE records, the Sheriff has effectuated every single detainer he has received since at least 2015.

76. As multiple jail officers told Mr. Brown, the Sheriff's policy dictated that Mr. Brown would be held on the detainer no matter what, as long as the detainer remained in effect. Every employee he spoke to confirmed this same policy, including the person responsible for managing the jail, Lieutenant Linares.

77. Despite Mr. Brown's offer to produce a birth certificate and the Sheriff's own records showing that he was born in Philadelphia—both proof of U.S. citizenship—every one of

15

the Sheriff's officers understood the Sheriff's policy to require Mr. Brown's re-arrest based on the detainer.

78. The Sheriff's Office has issued a written policy directive, called Bureau Directive 2.013, which directs officers to extend a person's detention whenever there is an ICE hold in place.

79. The Sheriff has no written policies, guidance, or training that addresses circumstances in which officers should *not* respond to an ICE detainer request. The Sheriff simply effectuates each one.

80. The Sheriff's Office does not train its officers on how to evaluate or respond to information indicating that the target of an ICE detainer is a U.S. citizen or otherwise not subject to removal. Its officers therefore do not know about the legal standards for removability, naturalization, or derivative citizenship; the methods for verifying a person's citizenship or immigration status; or the proper people to contact at ICE or other federal agencies. And the Sheriff's Office has no system in place for tracking or investigating claims of U.S. citizenship.

81. The Sheriff's Office recently held at least one other U.S. citizen for ICE. As the official in charge of the jail, the Sheriff was aware of that serious incident, as well as Mr. Brown's detention.

82. In the wake of that earlier incident, the Sheriff failed to implement any policies or training to ensure he has probable cause whenever he holds a person for ICE. The Sheriff is aware that his officers are effectuating all of the detainers they receive.

83. The Sheriff's Office's policy and practice is to hold people on detainers even when it lacks probable cause.

84. The Sheriff cemented this policy and practice in February 2018, when he signed an agreement with ICE to be reimbursed when he holds people on detainers. The agreement, which the Sheriff signed on February 14, 2018, is called a Basic Ordering Agreement, or "BOA."

85. The Sheriff, along with other counties in Florida, announced the BOA at a January 17, 2018 press conference, at which the Sheriff reaffirmed his commitment to holding people on ICE detainers. Sheriff Ramsay participated personally in the press conference to announce his agency's participation in the BOA program.

86. A BOA is not a contract, but rather an agreement that sets the terms for ongoing collaboration. It does not deputize local officers to perform immigration-officer functions pursuant to the training, certification, and supervision requirements of 8 U.S.C. § 1357(g)(1). Rather, the BOA simply reflects ICE's agreement to pay the Sheriff $50 every time the Sheriff holds an individual on an ICE detainer. To keep track of such individuals, ICE sends an additional piece of paperwork with each detainer: an I-203 form, which is used to track an inmate's location. But the detainer request still works the same way, and is still conveyed through the same I-247A form.

87. Since signing the BOA, the Sheriff has continued to effectuate every detainer he receives.

## COUNTS

**Count 1 – Section 1983 Claim for Violation of the Fourth Amendment:**

**Unconstitutional Seizure**

88. All the foregoing allegations are reincorporated herein.

89. The Fourth Amendment to the United States Constitution prohibits "unreasonable searches and seizures," which, at a minimum, requires arresting officers to have probable cause that the person is removable.

90. Holding a person on an immigration detainer constitutes a new seizure for Fourth Amendment purposes, and therefore requires a new probable cause justification.

91. The Sheriff's Office seized Mr. Brown without probable cause. U.S. citizens are never subject to removal from the United States or detention for immigration purposes. Mr. Brown repeatedly told the Sheriff's Office that he was a U.S. citizen, and the Sheriff's own files established that Mr. Brown is a U.S. citizen.

92. The Fourth Amendment does not allow arresting officers to ignore information that negates probable cause and does not relieve them of their responsibility to conduct an investigation when it is safe and feasible to do so.

93. In seizing Mr. Brown, the Sheriff was acting under color of state law.

94. The Sheriff's policy and practice of complying with all ICE detainer requests caused its violation of Mr. Brown's Fourth Amendment rights.

95. As a result of the Sheriff's unconstitutional seizure, Mr. Brown suffered, and continues to suffer, severe emotional harm.

96. As a result of the Sheriff's unconstitutional seizure, Mr. Brown was unable to work for approximately two weeks after his eventual release.

### Count 2 – False Imprisonment under Florida Law

97. All the foregoing allegations are reincorporated herein.

98. Florida law prohibits the unlawful and unreasonable restraint of a person against his will.

99. Mr. Brown was unlawfully detained and deprived of liberty when the Sheriff re-arrested and refused to release him following the resolution of his local charges.

100. Mr. Brown was held against his will after state law required his release.

101. The Sheriff had no authority to re-arrest Mr. Brown without verifying his repeated explanation that he was a U.S. citizen.

102. Mr. Brown's arrest was unreasonable and unwarranted under the circumstances, given Mr. Brown's repeated statements to multiple jail officers and the Sheriff's complete failure to investigate his claims over multiple weeks.

103. Pursuant to Fla. Stat. § 768.28(6), Mr. Brown has provided the requisite administrative notice of his false imprisonment claim.

## PRAYER FOR RELIEF

Wherefore, Mr. Brown respectfully requests that this Court enter judgment in his favor and, in addition:

A. Declare that his seizure by Sheriff Ramsay pursuant to his detainer policy and practice violates Mr. Brown's rights under the Fourth Amendment of the U.S. Constitution;

B. Declare that Mr. Brown's detention and deprivation of liberty by the Sheriff constitutes false imprisonment under Florida law;

C. Award Mr. Brown appropriate compensatory damages;

D. Award Mr. Brown reasonable attorney's fees and costs under 42 U.S.C. § 1988; and

E. Grant any other relief the Court deems just and proper.

Dated: December 3, 2018

Spencer E. Amdur*
Cody H. Wofsy*
American Civil Liberties Union
39 Drumm Street
San Francisco, CA 94111
Telephone: (415) 343-1198
samdur@aclu.org
cwofsy@aclu.org

Omar C. Jadwat*
Lee Gelernt*
American Civil Liberties Union
125 Broad Street
New York, NY 10004
Telephone: (212) 549-2500
ojadwat@aclu.org
lgelernt@aclu.org

Avi Garbow*
Gibson, Dunn & Crutcher LLP
1050 Connecticut Avenue, N.W.
Washington, DC 20036
Telephone: (202) 955-8500
agarbow@gibsondunn.com

Jonathan N. Soleimani*
Jason S. Kim*
Gibson, Dunn & Crutcher LLP
333 South Grand Avenue
Los Angeles, CA 90071
Telephone: (213) 229-7000
jsoleimani@gibsondunn.com
jkim@gibsondunn.com

Respectfully submitted,

/s/ Amien Kacou
Amien Kacou (Fl. Bar No. 44302)
ACLU Foundation of Florida, Inc.
4023 N. Armenia Avenue, Suite 450
Tampa, FL 33607
Telephone: (813) 288-8390
akacou@aclufl.org

Nancy Abudu (Fla. Bar No. 111881)
ACLU Foundation of Florida, Inc.
4343 W. Flagler St., Suite 400
Miami, FL 33134
Telephone: (786) 363-2700
nabudu@aclufl.org

Sarah M. Rich*
Southern Poverty Law Center
150 E. Ponce de Leon Ave., Suite 340
Decatur, GA 30030
Telephone: (404) 521-6700
Fax:          (404) 221-5857
sarah.rich@splcenter.org

Viviana Bonilla López (Fla. Bar No. 1003205)
Southern Poverty Law Center
4770 Biscayne Blvd., Ste. 760
Miami, Florida 33137
Telephone: (786) 347-2056
Fax:          (786) 237-2949
viviana.bonillalopez@splcenter.org

*Attorneys for Plaintiff*
*\*Pro hac vice application forthcoming*