Page 1

```
            UNITED STATES DISTRICT COURT
            SOUTHERN DISTRICT OF FLORIDA
                  KEY WEST DIVISION


PETER SEAN BROWN,              CASE NO.:  18-CV-10279
        Plaintiff,
-vs-
RICHARD A. RAMSAY, in his
official capacity as SHERIFF
OF MONROE COUNTY,
        Defendant.
_____/




                    DEPOSITION
                        OF
           SERGEANT EYNER GONZALEZ DIAZ




                5501 College Road
               Stock Island, Florida
                 October 17, 2019
              Scheduled for 2:00 p.m.
        Commencing at 2:00 p.m. to 3:26 p.m.
```

Veritext Legal Solutions
212-279-9424  www.veritext.com  212-490-3430

1  Q.  A dozen times a day?
2  A.  Yes.
3  Q.  Okay. When you were a detention deputy did you
4  consider it to be part of your job to check an inmate's
5  records if there seemed to be a potential discrepancy or
6  error in the records?
7       MR. JOLLY: Form. Answer.
8  A.  No.
9  Q.  (By Ms. Rich) Why not?
10 A.  Repeat the question.
11 Q.  Sure. If it was brought to light that there
12 might be an error in the records did you consider it your
13 job as detention deputy to look into those records and see
14 if there was any error?
15      MR. JOLLY: Form. Go ahead.
16 A.  No.
17 Q.  (By Ms. Rich) And so then my follow-up is why
18 not?
19 A.  I would relay that information to Records.
20 Q.  And the records department could take care of
21 that; is that right?
22 A.  Sure.
23 Q.  Did you ever have to do that?
24 A.  No.
25 Q.  So as I mentioned earlier, this case is about

1  A. No, ma'am.
2  Q. Thank you. In April of 2018 what was your
3  understanding of Monroe County Sheriff's Office's policy
4  on enforcing ICE detainers?
5  MR. JOLLY: Form. Go ahead.
6  A. We would receive a copy of the -- we would
7  receive the I-247 and then we would go serve it to the
8  individual and advise them that they have a ICE hold.
9  They receive a copy of it. That was my understanding.
10  Q. Do you know what happened after that?
11  MR. JOLLY: Form.
12  Q. (By Ms. Rich) With respect to the process of
13  holding someone for ICE?
14  A. Yes. So if they had locals, they would finish
15  their locals.
16  Q. You mean local charges?
17  A. Yes, ma'am.
18  Q. Okay.
19  A. And then the respected agency that placed the
20  detainer would be notified once those locals were
21  complete and then they would come and we would set up
22  transport for that individual to be picked up from our
23  agency.
24  Q. And your portion of that process as a detention
25  deputy assigned to intake was to deliver the I-247A to the

1  inmate and that was it?
2  A. Yes, ma'am.
3  Q. Is that right? Okay. You were not involved in
4  notifying the agency that had placed the ICE hold?
5  A. No, ma'am.
6  Q. Or in transferring the individual to the custody
7  of the other agency; is that correct? You were not
8  involved in that?
9  A. No, ma'am.
10 Q. Okay. As of April 2018 was it your
11 understanding that Monroe County Sheriff's Office enforced
12 all ICE detainers?
13 A. Yes.
14 Q. Were you aware of any incidents where MCSO
15 declined to enforce an ICE detainer?
16 A. No, ma'am.
17 Q. And was that the policy even when an inmate
18 raised claims of U.S. citizenship?
19 THE COURT: Form.
20 A. You refer to policy?
21 Q. (By Ms. Rich) Let me start again. In
22 April 2018 did you understand MCSO to have a policy on
23 enforcing ICE detainers?
24 A. General order. No policy.
25 Q. What's a general order?

1   Okay. Before 2018 did anyone ever tell you what
2   MCSO's policy was related to enforcing ICE detainers?
3       A.   Yes.
4       Q.   Who told you?
5       A.   Our sergeant.
6       Q.   That was Sergeant Arguello?
7       A.   Yes.
8       Q.   What other command staff told you about that?
9       A.   Just Sergeant Arguello.
10      Q.   And what did he tell you?
11      A.   The general practice of following the I-247
12  procedures, serving it to the individual.
13      Q.   And you're referring to the same general order
14  e-mail that we were talking about?
15      A.   Yes.
16      Q.   Did he tell you in any other way what MCSO's
17  policy was as to enforcing ICE detainers?
18      A.   No, ma'am.
19      Q.   Since April of 2018 has MCSO declined to enforce
20  any ICE detainers?
21      A.   Not to my knowledge.
22      Q.   Since April of 2018 have there been any other
23  claims of U.S. citizenship by anyone with an ICE
24  detainer --
25      A.   Not to my knowledge.

Page 48

1  phone?
2      A.   Yes, it's generally a supervisor from ICE.
3      Q.   Who do you normally speak with?
4      A.   It changes throughout the shift.
5      Q.   But it's someone at the supervisor level?
6      A.   Yes, ma'am.
7      Q.   Was that the same back in April of 2018, you
8  could reach someone at ICE if you called them?
9      A.   Yes.
10     Q.   Are you aware of any written MCSO policy
11 addressing circumstances when an ICE hold should not be
12 enforced?
13     A.   Not to my knowledge.
14     Q.   Are you aware of any other written MCSO document
15 addressing circumstances when an ICE hold should not be
16 enforced?
17     A.   Not to my knowledge.
18     Q.   Are you aware of any unwritten MCSO policy
19 addressing circumstances when an ICE hold should not be
20 enforced?
21     A.   Not to my knowledge.
22     Q.   Have you received any training at MCSO on when
23 not to enforce an ICE hold?
24     A.   No specific training.
25     Q.   Received any general training?

1      A.   Yes.
2      Q.   To your knowledge did Deputy Hubbard take any
3  steps to investigate Mr. Brown's claim of citizenship?
4      A.   I am not aware.
5      Q.   To your knowledge did anyone else at MCSO take
6  any steps to investigate Mr. Brown's claim of citizenship?
7      A.   I'm not aware.
8      Q.   To your knowledge did anyone else at MCSO
9  contact ICE with regards to Mr. Brown's claims of U.S.
10 citizenship?
11     A.   I am not aware.
12     Q.   So you wrote to Mr. Brown in your response, "It
13 is not up to us to determine the validity of the ICE
14 hold."
15          Did I read that correctly?
16     A.   Yes, you read the partial statement correctly.
17     Q.   Yeah, I didn't quote the entire answer, but that
18 is one sentence within your answer, right?
19     A.   Yes.
20     Q.   When you wrote us, were you referring to MCSO?
21     A.   Yes.
22     Q.   And why did you write this to Mr. Brown?
23     A.   He's required to receive a response.  And I
24 don't have -- as I, I say I, I mean we, the sheriff's
25 office, we do not have access to the ICE's data base and

1  we cannot change ICE's hold. So that would be between,
2  as stated in the response, it's between you, your
3  attorney and ICE.
4      Q.  And in April of 2018 was that your understanding
5  of MCSO policy regarding detainers?
6      A.  Yes.
7      Q.  Just so I'm clear, MCSO policy in April of 2018
8  was that if an inmate with ICE hold raised to MCSO
9  personnel that he was a U.S. citizen and therefore
10 ineligible for deportation, MCSO would not investigate
11 that claim?
12         MR. JOLLY:  Form.
13     A.  Yes.
14     Q.  (By Ms. Rich)  And MCSO policy in April of 2018
15 was that if that same inmate with an ICE hold raised a
16 claim of U.S. citizenship, MCSO would continue to hold
17 that person for ICE, correct?
18         MR. JOLLY:  Form.
19     A.  Yes.
20     Q.  (By Ms. Rich)  Up through April of 2018 are you
21 aware of any instances where MCSO declined to enforce an
22 ICE detainer?
23     A.  Not specifically, no.
24     Q.  Are you aware of any instances more generally?
25     A.  Not specifically.  I mean if you have

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
KEY WEST DIVISION

Case No. 18-cv-10279

Peter Sean Brown,

    Plaintiff,

v.

Richard A. Ramsay, in his official
capacity as Sheriff of Monroe County,

    Defendant.
_____/

DEPOSITION OF

OFFICER POLLY DEIHL

Taken on behalf of the Plaintiff

Thursday, July 18, 2019
10:43 a.m. - 12:30 p.m.
U.S. Legal Support
600 Whitehead Street, Suite 207
Key West, Florida 33040

Examination of the witness taken before:

Suzanne Ex, CVR-M, FPR
U.S. Legal Support, Inc.
600 Whitehead Street, Suites 206-207
Key West, Florida 33040

1  ICE holds?
2      A.  No.
3      Q.  Since April 2018, are you aware of any
4  incidents in which an individual detained under an ICE
5  hold has claimed to be a U.S. citizen?
6          MR. JOLLY:  Objection to form.
7      A.  No.
8      Q.  Are you aware of any ICE hold that MCSO has
9  received since April 2018, but declined to enforce?
10         MR. JOLLY:  Objection to form.
11     A.  No.
12     Q.  So, to the best of your knowledge, MCSO has
13 enforced every ICE hold it has received since April 2018?
14         MR. JOLLY:  Objection, form.
15     A.  When I'm working, we haven't refused any.
16     Q.  And are you aware of MCSO refusing any when
17 you're not working?
18     A.  I don't know.
19     Q.  To the best of your knowledge, are MCSO's
20 policies with respect to ICE holds the same as they were
21 in April 2018, today?
22         MR. JOLLY:  Objection, form.
23     A.  I don't know when they changed the policy.  I
24 don't know what day it was.
25     Q.  Are you aware of any changes to MCSO's

```
 1                UNITED STATES DISTRICT COURT
                  SOUTHERN DISTRICT OF FLORIDA
 2                     KEY WEST DIVISION

 3

 4   PETER SEAN BROWN,

 5       Plaintiff,

 6   vs.                              CASE NO. 18-cv-10279

 7   RICHARD A. RAMSAY, in his
     official capacity as Sheriff
 8   of Monroe County,

 9       Defendant.
     _____/
10

11

12

13

14                        DEPOSITION

15                            OF

16                   ANDREW PASKIEWICZ

17                   Page 1 through 78

18

19
                    Friday, July 19, 2019
20                  9:53 a.m. to 12:05 p.m.
                     600 Whitehead Street
21                    Key West, Florida

22

23
                 Stenographically Reported By:
24
                     DOREEN M. STRAUSS
25
```

1   Q   Okay, and can you describe that process for
2   me?
3   A   It's just taking their information and, and
4   just writing it down verbatim for what they have.
5   Q   And who would have taken down that
6   information verbatim?
7   A   Usually whoever either personally that would
8   have got it, or if it was faxed, whoever received the fax
9   should have done that.
10  Q   And did that information from the 247 to the
11  204, would that include information about an individual's
12  citizenship?
13  A   Citizenship, I do not believe so.
14  Q   Okay.  What information would it include?
15  A   I believe their nationality, country of
16  origin.
17  Q   Now, as part of the process of taking
18  information from the 247, putting it into the 204, does
19  MCSO investigate any of the information in the 247?
20  A   No, not to my knowledge.
21  Q   Okay.  Are you aware of any instance in which
22  MCSO has investigated information in a 247 before putting
23  it into a 204?
24  A   No.
25  Q   Now, as part of the process of taking the

```
 1    A     Yes.
 2    Q     So how does MCSO receive holds from ICE?
 3    A     Either by fax or in person.
 4    Q     Okay.  If ICE receives a hold --
 5          MR. BRUCE JOLLY:  If ICE?
 6    Q     I'm sorry.  If MCSO receives a hold from ICE
 7  in person, who appears in person?
 8    A     I've only done that with Border Patrol in
 9  Marathon --
10    Q     Okay.
11    A     -- when an arrest would be -- you know, upon
12  arrest since the station is right there.
13    Q     Do you personally have any responsibilities
14  related to ICE holds?
15    A     When I receive an ICE hold, yes.  My
16  responsibility would be to notify that person that he has
17  an ICE hold, give them a copy of it, and also put it in
18  our Jail Booking system under the release that this person
19  has a hold and whatever information that, whatever person
20  that dropped him off or whatever agency, and a contact
21  number.
22    Q     And did you have any of those
23  responsibilities in or around April 2018?
24    A     No.  Well, I'm sorry.
25    Q     Did you have any --
```

1   Q   Okay. Are you aware of any policy at MCSO
2  that would have required you to confirm that that
3  information in correct?
4   A   No.
5   Q   Are you aware of anyone else that has made
6  any attempts --
7   A   No.
8   Q   -- that has made any attempts to confirm that
9  information is correct?
10   A   Not to my knowledge.
11   Q   And has an inmate, upon receiving an ICE
12  hold, ever told you that the information in that ICE hold
13  is incorrect?
14       MR. BRUCE JOLLY: Asked and answered. You
15  will answer it again.
16   A   No.
17   Q   At any point during your time at MCSO, did
18  you receive or are you aware of any written policy
19  addressing circumstances in which an ICE hold should not
20  be enforced?
21   A   No, don't recall.
22   Q   And does MCSO have a policy of enforcing all
23  ICE detainers?
24   A   To my knowledge, yes.
25   Q   Does MCSO have a policy to enforce all ICE

```
 1   APPEARANCES FOR THE PLAINTIFF
                AMIEN KACOU, ESQUIRE
 2           ACLU Foundation of Florida, Inc.
          4023 North Armenia Avenue, Suite 450
 3                 Tampa, Florida 33607
                   akacou@aclufl.org
 4
                         and
 5
                SARAH M. RICH, ESQUIRE
 6             Southern Poverty Law Center
        150 East Ponce de Leon Avenue, Suite 340
 7               Decatur, Georgia  30030
                sarah.rich@splcenter.org
 8

 9           APPEARANCE FOR THE DEFENDANT
                BRUCE W. JOLLY, ESQUIRE
10       Purdy, Jolly, Giuffreda, Barranco & Jisa, P.A.
            Galleria Corporate Centre, Suite 1216
11               2455 East Sunrise Boulevard
              Fort Lauderdale, Florida  33304
12                  bruce@purdylaw.com

13
                       ALSO PRESENT
14       Andrew Jolly, law clerk for Bruce W. Jolly, Esquire

15
                         I N D E X
16   DEPONENT                                          PAGE
         MAJOR TIMOTHY AGE
17           Direct Examination by Mr. Kacou            3

18                       E X H I B I T S

19   Plf's  Description                                Page
       1    Notice of Deposition                         7
20     2    Bureau Directive: BOC - 2:014               16
       3    Bureau Directive: BOC - 5:003               30
21     4    Bureau Directive: BOC - 2:016               53
       5    Bureau Directive: BOC - 2:013               60
22     6    6-26-19 List of All Inmates Over Time Period 63
       7    Plf's First Set of Requests for Production  86
23     8    (marked but not referenced)
       9    Detainee Request/Grievance Log              70
24    10    Detainee Request/Grievance Log Answered In-house  76
      11    Composite of Request Reports                77
25
```

```
 1   read into it and what she would put as the nature of the
 2   grievance.  I don't know.
 3       Q   Is there policy that instructs Ms. Curry to
 4   distinguish complaints from grievances, specifically
 5   complaints --
 6       A   No.
 7       Q   You stated that the -- a grievance would be -- so
 8   you stated that a complaint about an ICE detainer would be
 9   typically handled by a shift lieutenant?
10       A   Yes.
11       Q   Yes.  And you stated that the shift lieutenant
12   would investigate the complaint if necessary and respond
13   accordingly?
14       A   (The deponent nodded.)
15       Q   Correct?  Right?
16           MR. JOLLY:  Objection.  Form.
17       Q   Sure.  But for clarity, are there any specific
18   requirements?  And I apologize if we've gone over some of
19   this not too long ago.  But again, for clarity, are there
20   any specific requirements on the shift lieutenant for the
21   manner of processing complaints about detainers?
22       A   No.
23           MR. JOLLY:  Objection.  Form.
24       Q   Are there any expectations on shift lieutenants
25   for the manner in which complaints about detainers must be
```

```
 1  processed?  Expectations, of course, from MCSO.
 2           MR. JOLLY:  Form.
 3       Q   And I will define further.  Expectations defined
 4  broadly to include policies or practices.  Anything at all?
 5       A   I can't answer that.
 6       Q   So a complaint about a detainer goes to a shift
 7  lieutenant who has no specific duty to do anything at all
 8  about it; is that correct?
 9           MR. JOLLY:  You are screwing this up.  But go
10       ahead.  Do your best.  Do your best, major.
11           MR. KACOU:  That is suggestive language.
12           MR. JOLLY:  That was suggestive language, that
13       you're screwing it up?  I'm sorry, I didn't mean to
14       suggest.  I meant to say it.
15           MR. KACOU:  Let's not engage.
16           MR. JOLLY:  You're screwing it up.  Major, do the
17       best you can.
18       A   What's the question?
19       Q   That's the problem.  It's distracting.  So would
20  you agree when a shift lieutenant receives a complaint, the
21  shift lieutenant has no specific duty to do anything about
22  it when the complaint is about a detainer?
23           MR. JOLLY:  Objection.  Form.  See, I can't give
24       you any more information.  So if he is unwilling to
25       make it right, I can't do anything about it.
```

```
 1        MR. KACOU:  He can tell me if it's not clear.  I
 2   can help with that.
 3        MR. JOLLY:  No, I can help you, but you don't want
 4   to hear from me.
 5        MR. KACOU:  There is a reason for that.  You're
 6   the defendant's attorney.
 7        MR. JOLLY:  Oh, I'm sorry.  I didn't think you
 8   wanted us to engage.
 9   Q    Would you like me to clarify?
10   A    Yeah.  I don't know how to answer what you're
11   asking me.
12   Q    I'm trying to find out whether or not there is a
13   policy at MCSO that requires shift lieutenants who receive
14   complaints about detainers to investigate those complaints.
15        MR. JOLLY:  Objection.  Form.
16   Q    When they do receive such complaints, or if they
17   receive such complaints.
18        MR. JOLLY:  Same objection.
19   A    I don't know.
20   Q    Okay.  Would a shift lieutenant -- I apologize if
21   I'm going around this.  I'm trying to make sure you're
22   clear, on the record, especially.  So a shift lieutenant who
23   receives a complaint from an inmate about a detainer would
24   not violate an MCSO policy by not investigating that
25   complaint?
```

```
 1      A      Correct.
 2             MR. JOLLY:  Objection.  Form.  You've answered.
 3             MR. KACOU:  Actually, he was answering, but I did
 4      not hear it because you were talking.  It's true.
 5             MR. JOLLY:  I am sorry, apparently you don't want
 6      me to make objections.
 7      Q      Let me rephrase.  I believe you said "correct"?
 8      A      Yes.
 9      Q      Thank you.  All right.  Let me refer you to
10      Exhibit Number 2, I believe, titled Bureau Directive 2:014.
11      Do you see it?
12      A      Yes.
13      Q      Okay.  Are you familiar with -- oh, let me in fact
14      refer you specifically to a bullet point under -- on page 1,
15      under the heading "Inmate Admission File."
16      A      Okay.
17      Q      First bullet point.
18      A      Okay.
19      Q      Second bullet point.  Do you see it?
20      A      Yes.
21      Q      Okay.  What do the -- what does FCAC refer to?
22      A      9.08.
23             MR. JOLLY:  He is asking what the initials stand
24      for.
25      A      Florida Corrections Accreditation Commission.
```

Major Age
July 16, 2019                                                43

```
 1        Q    Okay.  Does FCAC, the Florida Corrections
 2   Accreditation Commission, impose any standards on MCSO for
 3   the type of information to be kept on inmates?
 4        A    Yes.
 5        Q    Does that information include place of birth?
 6        A    We would have to pull the standard and review it.
 7   I know it's in Chapter 14.
 8        Q    Chapter 14 of FCAC?
 9        A    Yes.
10        Q    So FCAC is in effect defining MCSO policy?
11             MR. JOLLY:  Objection.  Form.
12        Q    I can rephrase.  I can be more clear.  But the
13   standards in Chapter 14, which you just mentioned, establish
14   MCSO's policy with respect to the type of information that
15   you are required --
16        A    They assist.
17        Q    They assist?
18        A    (The deponent nodded.)
19        Q    You're not required?
20        A    Yes.  If there is a standard, we have to comply.
21        Q    And if --
22        A    But that's not limited to that information.
23        Q    Understood.  And if there is a standard, it will
24   be found in Chapter 14?
25             MR. JOLLY:  Of the Florida Administrative Code.
```