**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

Peter Sean Brown,

        Plaintiff,

    v.

Richard A. Ramsay, in his official capacity as
Sheriff of Monroe County,

        Defendant.

Case No. 18-cv-10279

**PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT**
**AND MEMORANDUM OF LAW IN SUPPORT**

# TABLE OF CONTENTS

Page

**INTRODUCTION**..................................................................................................................1

**BACKGROUND** ..................................................................................................................2

**STANDARD OF REVIEW** ...............................................................................................5

**ARGUMENT** ......................................................................................................................6

I.   Because MCSO Held Mr. Brown Without Probable Cause Pursuant to MCSO
     Policy, Mr. Brown Is Entitled to Summary Judgment on His Fourth Amendment
     Claim...........................................................................................................................6

    A.   MCSO Violated Mr. Brown's Fourth Amendment Rights by Seizing Him
          Without Probable Cause. ...................................................................................6

        1.   ICE Did Not Have Probable Cause to Issue the Detainer...........................7

        2.   Extensive Evidence of Mr. Brown's U.S. Citizenship Dissipated
               Any Probable Cause.....................................................................................9

    B.   MCSO's Policy of Unquestioningly Complying with Detainers Caused the
          Violation. ........................................................................................................12

II.   Mr. Brown Is Entitled to Summary Judgment on His False Imprisonment Claim............15

III.  Mr. Brown Is Entitled to Summary Judgment on His Declaratory Judgment
      Claim..........................................................................................................................17

**CONCLUSION** ................................................................................................................18

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*A&M Gerber Chiropractic LLC v. GEICO Gen. Ins. Co.*,
  925 F.3d 1205 (11th Cir. 2019) ........................................................................17

*Alcocer v. Mills*,
  906 F.3d 944 (11th Cir. 2018) ..........................................................................6

*Anderson v. Liberty Lobby, Inc.*,
  477 U.S. 242 (1986)...........................................................................................5

*Bd. of Cty. Comm'rs of Bryan Cty., Okl. v. Brown*,
  520 U.S. 397 (1997).........................................................................................15

*Carter v. Butts Cty.*,
  821 F.3d 1310 (11th Cir. 2016) ........................................................................12

*City of S. Miami v. Desantis*,
  408 F. Supp. 3d 1266 (S.D. Fla. 2019) ..............................................................6

*Cozzi v. City of Birmingham*,
  892 F.3d 1288 (11th Cir. 2018) ............................................................7, 10, 12

*Creedle v. Miami-Dade Cty.*,
  349 F. Supp. 3d 1276 (S.D. Fla. 2018) ..................................................6, 14–18

*Emory v. Peeler*,
  756 F.2d 1547 (11th Cir. 1985) ........................................................................17

*Evett v. DETNTFF*,
  330 F.3d 681 (5th Cir. 2003) ............................................................................10

*Gonzalez v. Immigration & Customs Enforcement*,
  No. 12-CV-09012-ABFFMX, 2019 WL 4734579 (C.D. Cal. Sept. 27, 2019)................17–18

*Griffin v. City of Opa-Locka*,
  261 F.3d 1295 (11th Cir. 2001) ........................................................................15

*Harder v. Edwards*,
  174 So. 3d 524 (Fla. 4th DCA 2015) ................................................................16

*Hernandez v. United States*,
  939 F.3d 191 (2d Cir. 2019)...............................................................6, 7, 9–12, 15

*Holloman ex rel. Holloman v. Harland*,
  370 F.3d 1252 (11th Cir. 2004) ........................................................................... 13

*J W ex rel. Tammy Williams v. Birmingham Bd. of Educ.*,
  904 F.3d 1248 (11th Cir. 2018) ........................................................................... 18

*Johnson v. Barnes & Noble Booksellers, Inc.*,
  437 F.3d 1112 (11th Cir. 2006) ........................................................................... 16

*Kingsland v. City of Miami*,
  382 F.3d 1220 (11th Cir. 2004) ............................................................... 7, 10–12

*Mathis v. Coats*,
  24 So. 3d 1284 (Fla. 2d DCA 2010) ..................................................................... 16

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
  475 U.S. 574 (1986) .............................................................................................. 5

*McKusick v. City of Melbourne*,
  96 F.3d 478 (11th Cir. 1996) ............................................................................... 14

*Monell v. Dep't of Social Services of the City of New York*,
  436 U.S. 658 (1978) ....................................................................................... 6, 12

*Morales v. Chadbourne*,
  235 F. Supp. 3d 388 (D.R.I. 2017) ...................................................................... 14

*Morales v. Chadbourne*,
  793 F.3d 208 (1st Cir. 2015) ................................................................................. 6

*Smith v. Thurston*,
  2017 WL 2838183 (S.D. Fla. June 30, 2017) ...................................................... 16

*United States v. Hensley*,
  469 U.S. 221 (1985) .............................................................................................. 7

*United States v. Webster*,
  750 F.2d 307 (5th Cir. 1984) ................................................................................ 7

*Whiteley v. Warden, Wyo. State Penitentiary*,
  401 U.S. 560 (1971) .............................................................................................. 7

*Ziegler v. Martin Cty. Sch. Dist.*,
  831 F.3d 1309 (11th Cir. 2016) ........................................................................... 15

**Statutes**

28 U.S.C. § 2201 ...........................................................................................................17

F.S.A. § 322.08(c) .........................................................................................................11

F.S.A. § 322.051(1)(a)(3) ..............................................................................................11

**Rules**

Fed. R. Civ. P. 56(a) .......................................................................................................5

**Treatises**

Wright & Miller, 10B Fed. Prac. & Proc. Civ. § 2736 (4th ed.)......................................5

**Regulations**

6 C.F.R. § 37.11(g) ........................................................................................................11

Pursuant to Fed. R. Civ. P. 56, Plaintiff Peter Sean Brown ("Plaintiff" or "Mr. Brown") hereby moves for partial summary judgment as to liability on all claims, and as to declaratory relief.

## INTRODUCTION

Defendant Sheriff Richard A. Ramsay of the Monroe County Sheriff's Office ("Defendant" or "MCSO") has no excuse and no justification for having improperly detained Plaintiff Peter Sean Brown pursuant to a baseless immigration detainer issued by Immigration and Customs Enforcement ("ICE").[1]  ICE uses immigration detainers to ask local law enforcement agencies like MCSO to detain an individual, for up to 48 hours after he would otherwise be released from custody, to permit federal agents to arrive and assume custody.  But when local officers acquiesce to such a request, they effectuate a new arrest that must be supported by probable cause.  Even assuming MCSO can lawfully comply with some immigration detainers, it lacked probable cause to hold Plaintiff Peter Sean Brown on the detainer at issue here, and is therefore liable under 42 U.S.C. § 1983 and Florida state law.

Plaintiff is a U.S. citizen, born in Philadelphia, and thus categorically exempt from immigration detention or deportation.  MCSO lacked probable cause to re-arrest him on the detainer for two independent reasons.  *First*, ICE's initial request was itself unsupported by probable cause; indeed, ICE inexplicably ignored its own records, which clearly stated that Mr. Brown was not a removable non-citizen and that ICE had previously made exactly the same mistake in issuing a detainer for Mr. Brown.  Because MCSO chose to rely on ICE, it is responsible for the resulting unlawful arrest.  *Second*, the information presented to MCSO, and available in its own records, clearly indicated that Mr. Brown was a natural-born U.S. citizen, vitiating whatever probable cause the detainer might otherwise have relayed.  In carrying out its policy of complying with every detainer, no matter what contrary information or intervening circumstances arise, MCSO unlawfully re-arrested and held Mr. Brown for ICE—leaving him terrified of being banished from his country.  These facts are undisputed, and Mr. Brown is entitled to partial summary judgment as to liability and declaratory relief.

---

[1]     Sheriff Ramsay is only sued in his official capacity.

1

## BACKGROUND

Plaintiff Peter Sean Brown is a United States citizen, born in Philadelphia, Pennsylvania, in 1968.  Statement of Undisputed Facts ("SOF") ¶¶ 1–2.  On April 5, 2018, Mr. Brown was arrested by MCSO for an alleged probation violation.  SOF ¶ 3.  MCSO sent Mr. Brown's fingerprints to the FBI for a background check; the prints were then checked against Department of Homeland Security ("DHS") databases and generated a "possible match" to immigration records, which was sent to ICE's Miami field office.  SOF ¶¶ 4–5.  That possible match indicated that Mr. Brown's fingerprints were associated with a particular FBI number—941883MA2—and with DHS records.  SOF ¶ 6.

That possible match triggered an investigation into whether the field office would issue a detainer.  SOF ¶¶ 8–10.  ICE personnel did not interview Mr. Brown, but the officer investigating the possible match did conduct searches of various databases.  SOF ¶¶ 11, 13.  Among other databases, ICE officers reviewed information in the "Enforce Alien Removal Module" ("EARM")—a database that they "routinely use" to "[r]eview the status of a case."  SOF ¶¶ 14–15.  Indeed, a deportation officer would "always access EARM in deciding whether to issue a detainer."  SOF ¶ 18.

On April 6, 2018, the ICE Miami field office issued a detainer to MCSO for Mr. Brown, using DHS form I-247A.  SOF ¶ 31.  ICE's own records demonstrated that this was not the first detainer the federal government had wrongly issued for Mr. Brown.  Those records stated that, in 2005, immigration agents mistakenly concluded that Mr. Brown was another person—Peter *Davis* Brown—who was a removable non-citizen.  SOF ¶¶ 21–23, 25.  Mr. Brown was detained in New Jersey for almost a full day before agents realized their error and released him.  SOF ¶ 21.  As federal agents explained in comments regarding this 2005 incident, entered into EARM:

> THE DETAINER WAS PLACED ON AN INCORRECT PERSON.  THE PERSON THAT WAS DETAINED WAS NOT THE SUBJECT.  A FINGERPRINT SEARCH WAS CONDUCTED ON IAFIS AND THE SUBJECT DID NOT CORRESPOND TO THE PERSON THAT WAS DETAINED.  THE NAMES ARE THE SAME BUT THE PHOTOS AND PRINTS THAT WERE USED WERE USED IN ERROR.  THE PETER BROWN THAT WAS DETAINED [in New Jersey] IS A DIFFERENT PETER BROWN.  HIS FBI# 941883MA2 IS HIS NCIC RAP SHEET.  PETER DAVIS BROWN, THE ICE FUGITIVE HAS FBI#401663HA6. . . .   PETER SEAN BROWN WAS RELEASED.  PETER DAVIS BROWN . . . REMAINS AT LARGE.

SOF ¶ 26.  Those comments were available during the 2018 ICE investigation of Mr. Brown and visible as soon as one logged into EARM.  SOF ¶ 27.  Several officers from the field office investigating Mr. Brown in 2018, including the supervisor who approved the detainer, accessed and saw those notes, but ICE issued the new detainer anyway.  SOF ¶¶ 19–20, 27, 31.

The 2018 ICE detainer asked MCSO to hold Mr. Brown for up to 48 hours after he would otherwise have been released from MCSO custody.  SOF ¶ 32.  The detainer form contained no narrative specific to Mr. Brown, but instead contained checked boxes indicating that he had a final removal order and an unspecified "biometric confirmation" of his identity.  SOF ¶¶ 33–34.

MCSO complied with the ICE request to detain Mr. Brown.  SOF ¶ 35.  Mr. Brown was terrified to learn that he was going to be deported.  SOF ¶ 38.  Throughout Mr. Brown's custody at MCSO, over a period of weeks, he repeatedly told multiple MCSO employees, both orally and in writing, that he was a U.S. Citizen who could not be deported or held for ICE.  SOF ¶ 39.  He wrote, among other things:

> **On April 8, 2018:** I AM REQUIRING INFORMATION REGARDING LEGAL ADVICE PERTAINING TO A FALSE IMMIGRATION DETAINER.. I AM AND HAVE ALWAYS BEEN A U.S. CITIZEN AND THIS IS NOT THE FIRST TIME THIS HAS BEEN A[] HARRASSEMENT. I INTEND TO FILE LEGAL ACTIONS THIS TIME BECAUSE I ALLOWED IT TO BE DISMISSED AS A MISTAKE YEARS AGO.[2]

> **On April 16, 2018:** I have been wrongly accused and threatened with deportation from ICE[.]  I am and have always been a citizen of the United States.  This error happened previously over twenty years or so ago, while up north in NJ.[3]

> **On April 19, 2018:** IM TRYING TO OBTAIN INFORMATION CONCERNING A UNVALID ICE HOLD..IM A US CITIZEN..HOW IS THIS EVEN POSSIBLE.?[4]

> **On April 26, 2018:** I AM BEING MISCLASSI[FI]ED AS AN ILLEGAL JAMAICAN IMMIGRANT. . . .  MY PROBATION WAS RE/ENSTATED . . . I AM NOW BEING ILLEGALLY DETAINED ON AN APPARENT I.C.E. WARRENT WHICH IS ABSOLUTELY ABSURD..BEING AS THOUGH I AM A U.S.A. CITIZEN..BORN IN PHILADELPHIA, PENNSYLVANIA.. WHATEVER THIS MISTAKE IS NEEDS TO BE ADDRESSED AND RECTIFIED, BECAUSE [IT'S] ILLEGAL DETAINMENT . . . I HAVE ASKED

---

[2]     SOF ¶ 40.

[3]     SOF ¶ 41.

[4]     SOF ¶ 43.

FOR ASSISTANCE. WHICH HAS BEEN FUTILE AS OF YET . . . I REINTERATE I AM ILEGALLY BEING DETAINED FOR THIS ICE WARRENT [WHICH] IS TRULY INCORRECT AND UNJUSTIFIED.[5]

Moreover, MCSO's own inmate records—which MCSO officers regularly accessed in April 2018—showed, in multiple places, that Mr. Brown was a U.S. Citizen born in Philadelphia and had a valid Florida identification card.  SOF ¶¶ 50–53.

Despite all this information undermining any probable cause for MCSO's re-arrest of Mr. Brown for ICE, MCSO did not investigate the validity of Mr. Brown's detainer in any way.  SOF ¶ 58; *see also* Ex. C (Requests for Admission ("RFA")) Nos. 10–11; Ex. D (Answers to RFA) Nos. 10–11 (admitting that "MCSO did not contact ICE" nor "conduct its own investigation" "to determine whether Plaintiff was a U.S. citizen").  MCSO did not attempt to contact ICE or pass *any* of this information—including Mr. Brown's highly specific explanation that a detainer had previously been erroneously lodged against him—along to ICE.  SOF ¶ 62.  It declined to do so even though MCSO was "in touch with ICE via phone, e-mail and fax" at the time, and could easily have raised concerns about particular detainers.  SOF ¶¶ 59–60.  It did not even review Mr. Brown's MCSO file for the pertinent information, SOF ¶ 54, which was easily accessible to jail employees (including the employee who served the ICE detainer on Mr. Brown), SOF ¶¶ 55–56, and which listed information about inmates' citizenship and birthplace (including Mr. Brown's), SOF ¶¶ 49–51.  And when Mr. Brown repeatedly offered to arrange for a copy of his U.S. birth certificate to be sent to MCSO, officers told him not to bother because it would not change their decision to hold him on the detainer.  SOF ¶¶ 44–45.

On April 26, 2018, the county court held a probation violation hearing and ordered Mr. Brown released, but MCSO refused to release Mr. Brown and instead continued to hold him pursuant to the ICE detainer.  SOF ¶¶ 68–69.  Mr. Brown was terrified at the prospect of being deported to Jamaica, where he feared he, as a gay man, would be subject to abuse in detention.  SOF ¶ 71.  Again, Mr. Brown filed a written complaint informing MCSO of his citizenship and ineligibility for removal.  SOF ¶ 72.  The jail never responded.  *Id*.  During the late hours of April 26 through early on April 27, as Mr. Brown was being transferred to federal custody, he again told MCSO staff he was a citizen, and signed all his transfer forms by writing "U.S. Citizen" after his name.  SOF ¶¶ 73–74.  Rather than take any steps to address Mr. Brown's pleas, MCSO deputies

---

[5]     SOF ¶ 72.

instead taunted and mocked him about his repeated statements that he was from Philadelphia, not Jamaica—even as Mr. Brown was being shackled and turned over to federal agents for transport to Krome Detention Center, an immigration detention facility in Miami.  SOF ¶¶ 75–77.[6]

Once he was at Krome, Mr. Brown once again explained that he was a U.S. Citizen.  SOF ¶ 78.  An ICE agent—unlike any MCSO employee, *see* SOF ¶¶ 42–45—agreed to look at his birth certificate, SOF ¶ 79.  Mr. Brown's roommate was permitted to email Mr. Brown's birth certificate to an ICE officer that afternoon, and ICE hastily arranged for Mr. Brown's release after reviewing the information about his citizenship.  SOF ¶¶ 80, 83.  The ordeal caused serious emotional consequences, along with other harms like lost wages.  SOF ¶ 84.  Mr. Brown was severely depressed due to the terror he suffered at the hands of MCSO.  SOF ¶ 85.  He remains afraid that he will *again* be wrongfully held for the third time on an ICE detainer.  SOF ¶ 102.

Mr. Brown's experience should come as no surprise.  At the time of Mr. Brown's detention in 2018, MCSO had a policy, custom, and practice of acquiescing to *all* ICE detainers, notwithstanding any citizenship information about the subject individual it might receive.  SOF ¶ 86.  MCSO has never refused to honor an ICE detainer, SOF ¶ 93, and has previously detained individuals named in ICE detainers who were identified in MCSO's own records as U.S. citizens, SOF ¶ 94, without investigating these individuals' citizenship, SOF ¶ 95, despite being aware of hundreds of U.S. citizens improperly held on detainers in other jurisdictions, SOF ¶¶ 96–99.

## STANDARD OF REVIEW

Summary judgment is warranted when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see also* Wright & Miller, 10B Fed. Prac. & Proc. Civ. § 2736 (4th ed.) (Rule 56 authorizes partial summary judgment as to liability).  "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A material fact is not in genuine dispute if there is only "some metaphysical doubt."  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).

---

[6]     After Mr. Brown asked for help, one officer sang the Fresh Prince of Bel Air theme song— which references being "born and raised" in Philadelphia—and another sang "Don't worry, be happy," and "Everything is going to be all right," both songs widely associated with Jamaica.  SOF ¶ 76.

## ARGUMENT

I.    **Because MCSO Held Mr. Brown Without Probable Cause Pursuant to MCSO Policy, Mr. Brown Is Entitled to Summary Judgment on His Fourth Amendment Claim.**

Mr. Brown is entitled to partial summary judgment as to liability regarding Count 1, which alleges a Fourth Amendment violation pursuant to 42 U.S.C. § 1983 and *Monell v. Department of Social Services of the City of New York*, 436 U.S. 658 (1978).  "To demonstrate a *Monell* claim, the plaintiff must show: (1) the violation of a federal right occurred; (2) the existence of a municipal policy or custom; and (3) a causal connection between the violation and the municipal policy or custom."  *Creedle v. Miami-Dade Cty.*, 349 F. Supp. 3d 1276, 1301 (S.D. Fla. 2018) (internal quotation marks and alteration omitted).[7]

A.    **MCSO Violated Mr. Brown's Fourth Amendment Rights by Seizing Him Without Probable Cause.**

A detainer requests that a person who would otherwise be released from criminal custody instead be kept in jail to facilitate immigration enforcement.  As the Eleventh Circuit has concluded—like every court across the country to consider the question—such "continued detention" is a new arrest for which the Fourth Amendment demands "independent probable cause."  *Alcocer v. Mills*, 906 F.3d 944, 954 (11th Cir. 2018) (citing *Morales v. Chadbourne*, 793 F.3d 208, 217 (1st Cir. 2015)); *see also, e.g.*, *Hernandez v. United States*, 939 F.3d 191, 209 (2d Cir. 2019).

What *kind* of probable cause has been the subject of some debate.  This Court has held that local law enforcement officers conducting such detainer arrests generally require probable cause of a *crime*, *see, e.g.*, *Creedle*, 349 F. Supp. 3d at 1304–07, while other courts have suggested that only probable cause of removability is required, *see, e.g.*, *City of S. Miami v. Desantis*, 408 F. Supp. 3d 1266, 1300 & n.16 (S.D. Fla. 2019).  That question, however, is not material in this case. Even assuming *arguendo* that probable cause of removability is generally sufficient for local law enforcement officers to make arrests requested by ICE detainers, the undisputed facts establish that in *this* case MCSO had no probable cause, even of removability, to justify Mr. Brown's detention.

---

[7]    "The plaintiff must also show that the constitutional violation occurred 'under color of State law.'"  *Creedle*, 349 F. Supp. 3d. at 1301 (quoting *Monell*, 436 U.S. at 683).  MCSO has admitted that "[i]n seizing Mr. Brown, the Sheriff was acting under color of state law."  SOF ¶ 70.

In re-arresting Mr. Brown, it is undisputed that MCSO relied on ICE's request, rather than itself investigating whether he was a removable non-citizen.  MCSO will likely argue that the Sheriff could lawfully rely on the probable cause ICE had supposedly developed, under a doctrine known as the "fellow officer" or "collective knowledge" rule.  But relying on ICE's detainer does not shield MCSO from liability as a matter of law for two reasons.  *First*, ICE itself did not have probable cause because it had crystal-clear, irrefutable evidence before it that Mr. Brown was not a removable non-citizen—and that ICE had previously made exactly the same mistake.  *Second*, even assuming ICE had probable cause, MCSO had access to—and was confronted with— information that would have easily confirmed that Mr. Brown was a U.S. citizen, so MCSO could not rely on ICE's detainer to satisfy its obligation to arrest only on the basis of probable cause. For each of these reasons, Defendant's arrest of Mr. Brown violated the Fourth Amendment.

### 1.    ICE Did Not Have Probable Cause to Issue the Detainer.

MCSO's arrest of Mr. Brown lacked probable cause because ICE had no probable cause in the first place.  As the Second Circuit recently explained in an immigration detainer case, "[t]here can be no collective knowledge . . . if the initiating officer lacked probable cause . . . ." *Hernandez*, 939 F.3d at 209.  This rule is well settled.  *See, e.g.*, *United States v. Hensley*, 469 U.S. 221, 232 (1985) ("If the [request] has been issued in the absence of a reasonable suspicion, then a stop in the objective reliance upon [the request] violates the Fourth Amendment."); *Whiteley v. Warden, Wyo. State Penitentiary*, 401 U.S. 560, 568 (1971) (holding that "an otherwise illegal arrest cannot be insulated from challenge by the decision of the instigating officer to rely on fellow officers to make the arrest"); *United States v. Webster*, 750 F.2d 307, 323 (5th Cir. 1984) (holding that arrest violated Fourth Amendment because "where the arresting officer . . . simply carries out directions to arrest given by another officer . . . the officer who issues the directive must himself have probable cause to arrest").

Probable cause is assessed based on "the totality of the circumstances."  *Kingsland v. City of Miami*, 382 F.3d 1220, 1230 (11th Cir. 2004).  Thus, "in evaluating probable cause, an officer may not 'unreasonably disregard certain pieces of evidence' by 'choosing to ignore information that has been offered to him or her' or 'electing not to obtain easily discoverable facts' that might tend to exculpate a suspect." *Cozzi v. City of Birmingham*, 892 F.3d 1288, 1294 (11th Cir. 2018) (internal alterations omitted) (quoting *Kingsland*, 382 F.3d at 1229, 1233).  Here, the undisputed evidence reflects that ICE plainly lacked probable cause to issue the April 2018 detainer.  The ICE

agent who issued the detainer and his supervisor had easy access to—and actually reviewed—ICE records conclusively establishing that Mr. Brown was not the removable non-citizen they were looking for.  Specifically, one of ICE's primary enforcement databases specifically said that *federal immigration agents previously made the exact same mistake* with regard to Mr. Brown. SOF ¶¶ 14–30.  Yet ICE issued the erroneous detainer anyway, and MCSO then unquestioningly accepted and effectuated it.  SOF ¶¶ 31, 35, 58.

After Mr. Brown was booked into custody at the Monroe County jail for his underlying probation violation charge, the Miami ICE field office received an alert indicating a "possible match" to a removable non-citizen.  SOF ¶¶ 6–8.  But as ICE's designated witness explained, this potential database hit alone was not a sufficient basis to issue a detainer.  SOF ¶ 9.  Rather, an ICE officer was required to take further steps to investigate, including reviewing reports from multiple databases.  SOF ¶¶ 8, 10, 12.

Critical among these databases, for purposes of this case, was EARM.  *See* SOF ¶ 14. EARM—one of ICE's primary enforcement databases—shows information and comments about individuals' past encounters with federal immigration agents.  SOF ¶¶ 14–17.  ICE's designated witness testified that agents "*always* access EARM in deciding whether to issue a detainer."  SOF ¶ 18 (emphasis added).  Indeed, multiple ICE agents involved in the investigation of Mr. Brown and the issuance of the detainer on April 6, including the supervising officer who approved it, each accessed the EARM records associated with Plaintiff the day the detainer was issued.  SOF ¶ 19. When they did, they saw case "comments"—notes entered into the system—written by agents years earlier.  SOF ¶¶ 20–23, 25–27; *see also* Ex. GG (Ripa Dep.) 69:17–19 ("Would the comments that would be displayed on the first page be the most recent comments?  A. Yes.").

Those comments clearly explained that there were two separate individuals named Peter Brown: Peter Davis Brown, who was a non-citizen with a final removal order, and Peter Sean Brown (the Plaintiff), who was not.  SOF ¶¶ 22–23.  The EARM comments described how in 2005, a "DETAINER WAS PLACED ON AN INCORRECT PERSON"—specifically, Peter Sean Brown (the U.S. citizen plaintiff here) in New Jersey.  SOF ¶ 26.  The initial "possible match" the ICE Miami field office had received in 2018 was based on a fingerprint match associated with FBI number 941883MA2, SOF ¶ 6, and the comments explained that FBI number belonged to Peter *Sean* Brown, i.e. the Plaintiff, SOF ¶ 26.  As the comments explained: "THE PETER BROWN THAT WAS DETAINED [in New Jersey] IS A DIFFERENT PETER BROWN.  HIS FBI#

8

941883MA2 IS HIS NCIC RAP SHEET.  PETER DAVIS BROWN, THE ICE FUGITIVE HAS FBI#401663HA6."  SOF ¶ 26.  The comments further explained that in 2005 federal agents realized the error and released Plaintiff.  SOF ¶ 24.  ICE agents then memorialized the mistake in those extensive case comments entered into EARM.  SOF ¶ 25.  In other words, ICE's own database told the officers who accessed it in 2018 that the federal government had previously erroneously issued a detainer for Mr. Brown.  SOF ¶ 27.

Notably, moreover, the difference in middle names between the Plaintiff and the removable non-citizen, which the EARM comments emphasized, was apparent throughout the records the ICE officers examined.[8]  The initial possible match report included both an FBI number— Plaintiff's number—and an "Alien Registration Number" or "A number."  SOF ¶¶ 6–7.  The criminal history records ICE obtained using that FBI number included Plaintiff's name, Peter *Sean* Brown.  SOF ¶ 28.  By contrast, immigration records associated with the A number used the name Peter *Davis* Brown.  SOF ¶ 29.  Likewise, the possible match report indicated a different birthdate than that listed in the immigration records ICE examined.  SOF ¶ 30.

The ICE officers who investigated, issued, and approved Mr. Brown's detainer did not just fail "to conduct an inquiry when a reasonable officer in the circumstances would have inquired." *Hernandez*, 939 F.3d at 209.  They ignored the explicit warnings and definitive evidence that ICE had already made the same mistake and had exonerated Mr. Brown.  ICE thus clearly lacked probable cause to believe Mr. Brown was a removable non-citizen.  In re-arresting Mr. Brown, MCSO relied exclusively on the erroneous ICE detainer for purported probable cause of removability.  Under settled Fourth Amendment precedent, because ICE "lacked probable cause to issue the detainer," MCSO violated Mr. Brown's Fourth Amendment rights.  *Hernandez*, 939 F.3d at 209.

### 2.    Extensive Evidence of Mr. Brown's U.S. Citizenship Dissipated Any Probable Cause.

Even if ICE had initially developed probable cause, and even if MCSO could ordinarily rely on ICE's representation of probable cause in the context of a detainer, here, the facts known or easily available to MCSO vitiated that probable cause.  The arrest was therefore unlawful as a matter of law.  *Hernandez*, 939 F.3d at 201; *see also id*. at 208.

---

[8]    A "name discrepancy alone is arguably enough to vitiate probable cause . . . ."  *Hernandez*, 939 F.3d at 208.

As noted above, officers are not "permitted to turn a blind eye to exculpatory information that is available to them . . . ." *Kingsland*, 382 F.3d at 1228; *see also, e.g.*, *Cozzi*, 892 F.3d at 1297 (finding no probable cause where an officer, "[d]espite having been given plainly exculpatory and easily verifiable information," did not investigate differences between the plaintiff and suspect). This rule applies equally where, as here, an officer is relying on probable cause developed by another officer. In *Hernandez*, for example, the Second Circuit held that a city jail could not rely on an immigration detainer because the circumstances known to the city—including the plaintiff's statement's that he was a U.S. citizen and the jail's own records stating the same—indicated that he was not subject to immigration detention. 939 F.3d at 208 (holding "the City could not blindly rely on the federal detainer in the circumstances . . . [where plaintiff] told multiple [corrections] employees that he was a U.S. citizen, and the City could have easily verified his citizenship"); *see also, e.g.*, *Evett v. DETNTFF*, 330 F.3d 681, 688 (5th Cir. 2003) (fellow officer rule does not allow arresting officer to "disregard facts tending to dissipate probable cause"). Here, because MCSO officers ignored exculpatory facts about Mr. Brown's U.S. citizenship and failed to conduct a reasonable investigation into their easily available evidence, MCSO cannot rely on the ICE detainer to establish probable cause.

Mr. Brown told MCSO employees multiple times that he was a natural-born U.S. citizen, and lodged four formal written complaints explaining the same and in no uncertain terms informing officers that the detainer issued against him was a mistake. SOF ¶¶ 39–45, 72–74. One of Mr. Brown's written complaints stated that he was "wrongly accused and threatened with deportation from ICE," but had "always been a citizen of the United States." SOF ¶ 41. It also noted that, years prior, the federal government had mistakenly arrested him on similar immigration charges but released him after learning of his citizenship. *Id.* In reply, MCSO told Mr. Brown that it would hold him for ICE regardless and would not take any action to confirm his citizenship, stating "it is not up to us to determine the validity of the ICE hold." SOF ¶ 42. Mr. Brown repeatedly offered to produce his birth certificate to prove his citizenship, but MCSO officers told him that even his birth certificate would not change anything, because they would continue to hold him regardless. SOF ¶¶ 44–45. Mr. Brown also told an MCSO officer that he tried to call ICE multiple times but was not able to reach a representative, but the officer said there was nothing he could do. SOF ¶¶ 46–47.

After hearing that Mr. Brown was in jail, his friend and manager, Brooke Lynch, accessed MCSO's online inmate locator.  SOF ¶ 63.  She learned from the website that Mr. Brown had a "no bond" hold against him.  SOF ¶ 64.  She then called the jail to inquire about the hold and, when informed that he had an ICE detainer against him, she explained that Mr. Brown was a U.S. citizen.  SOF ¶¶ 66–67.  MCSO did not ask her for any more details, and did not say it would investigate.  SOF ¶ 67.

Moreover, highly relevant information, including Mr. Brown's U.S. citizenship and birth place in Philadelphia, was reflected in MCSO's own records system, SOF ¶¶ 50–51—which was available to and used by MCSO personnel throughout any given day, SOF ¶¶ 53, 55.  MCSO records also showed that Mr. Brown had a Florida identification card, SOF ¶ 52, which can be obtained only by citizens and non-citizens with authorization to be in the United States.[9]

When confronted with all this information undermining the assertions made in the detainer, MCSO had several options.  It could have decided not to hold Mr. Brown on the detainer.  It could have investigated his citizenship by, for example, asking to see his birth certificate (and facilitating his ability to produce it), or by checking other governmental records such as the Florida driver's license database.  *Cf.* SOF ¶¶ 80–81 (Mr. Brown's roommate was permitted to email his birth certificate to ICE after Mr. Brown was in federal custody); SOF ¶ 81 (ICE generated a Florida driver's license database printout after MCSO held Mr. Brown on the detainer, indicating "Citizenship Status: US Citizen;" "Country of Birth: US of America;" "State of Birth: Pennsylvania").[10]  At a bare minimum, MCSO could have picked up the phone to notify ICE that an individual subject to a detainer was repeatedly asserting he was a citizen, and had previously been subject to an erroneous detainer.  SOF ¶¶ 46–47.  If it had done so, ICE could have investigated further and cancelled the immigration detainer.  SOF ¶ 61.

What MCSO could *not* do is what it did here: "choose to ignore" Mr. Brown's claim of U.S. citizenship.  *Kingsland*, 382 F.3d at 1229 & n.10.  MCSO "could not blindly rely on the federal detainer in the circumstances here," where MCSO officers could have verified Mr. Brown's citizenship with "minimal effort."  *Hernandez*, 939 F.3d at 208.  Because MCSO received "easily verifiable exculpatory information," it acted unreasonably in failing to inquire into those relevant

---

[9]     *See* F.S.A. §§ 322.08(c), 322.051(1)(a)(3); 6 C.F.R. § 37.11(g).

[10]    MCSO had access to this database.  SOF ¶ 82.

circumstances. *Cozzi*, 892 F.3d at 1297; *see also Carter v. Butts Cty.*, 821 F.3d 1310, 1321 (11th Cir. 2016) ("A police officer may not . . . elect not to obtain easily discoverable facts." (internal quotation marks omitted)). Rather, MCSO had an obligation to conduct a reasonable investigation before it could execute the arrest requested by the detainer. *See Kingsland*, 382 F.3d at 1229–31; *Hernandez*, 939 F.3d at 208 ("the City had an independent obligation to verify Hernandez's citizenship"). On these undisputed facts, MCSO lacked probable cause to hold Mr. Brown on the detainer.

**B.      MCSO's Policy of Unquestioningly Complying with Detainers Caused the Violation.**

Under *Monell*, MCSO is liable for the violation of Mr. Brown's Fourth Amendment rights. It is well established that local governing bodies "can be sued directly under § 1983 . . . where, as here, the action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers." *Monell*, 436 U.S. at 690. Moreover, "local governments . . . may be sued for constitutional deprivations visited pursuant to governmental 'custom,'" even where the custom has not been formally promulgated. *Id.* at 690–91. In this case, the difference is immaterial—it was both official MCSO policy and a less formal but still universally understood and approved custom and practice to unquestioningly effectuate all ICE detainers without investigation—even in cases of potential U.S. citizenship. The decision to hold Mr. Brown in this case, despite the compelling indications that he was a citizen, was a straightforward application and implementation of that policy, custom, and practice.[11]

It is undisputed that MCSO's official policy and well-established custom and practice was to effectuate every ICE detainer, without question or investigation, no matter the circumstances and regardless of information in its possession about the detainee's U.S. citizenship and, consequently, ineligibility for removal. SOF ¶¶ 86–88. Indeed, "[MCSO] has *never* declined to execute an ICE detainer." SOF ¶ 93; Judge Torres Order (Sept. 6, 2019) (ECF No. 101) (emphasis added). Without exception, as MCSO has expressly admitted, MCSO "does not investigate claims of U.S. citizenship alleged by any inmates who MCSO holds or detains pursuant to a Detainer,

---

[11]     Sheriff Ramsay has conceded that he had final policymaking authority with regard to the actions at issue here. SOF ¶ 90.

Basic Ordering Agreements, and/or related ICE forms or agreements." SOF ¶ 86.[12]  The evidence of this policy, custom, and practice is extensive and undisputed—indeed, MCSO specifically represented during the course of discovery that it did "not intend to assert any lack of sufficient factual evidence to satisfy the *Monell* standard (assuming . . . that a constitutional violation is found)." Judge Torres Order (Nov. 20, 2019) (ECF No. 120) at 2.

In no uncertain terms, testimony from those charged with implementing the policy confirms that they were expected to ignore evidence of U.S. citizenship when effectuating ICE holds.[13]   For example, MCSO's designated Rule 30(b)(6) deponent, Tim Age, explained categorically that: "We didn't investigate people's claims of citizenship."  SOF ¶ 87.  Another MCSO employee confirmed that "MCSO enforces all ICE holds it receives" and "holds every inmate for ICE that ICE has identified in ICE holds." SOF ¶ 86; Ex. X (Linares Dep.) 62:7–63:8 ("Q. MCSO policy in April of 2018 was that if an inmate with [an] ICE hold raised to MCSO personnel that he was a U.S. citizen and therefore ineligible for deportation, MCSO would not investigate that claim? A. Yes.  Q. And MCSO policy in April of 2018 was that if the same inmate with an ICE hold raised a claim of U.S. citizenship, MCSO would continue to hold that person for ICE, correct?  A. Yes.").  Another testified that there would be "repercussions," including "verbal counseling," if he did not follow a "general order" to enforce all ICE detainers.  SOF ¶ 89.

MCSO's policy is borne out by MCSO's own records of the detainers it has effectuated. MCSO has admitted that, of the 173 ICE detainers it has received since 2014—all of which were effectuated—20 of the individuals detained were listed as U.S. citizens in SmartCop, MCSO's internal database.  SOF ¶¶ 48, 94.  MCSO officers use SmartCop on a regular basis, but re-arrested

---

[12]    MCSO Bureau Directive 2:013 directs officers to extend an inmate's detention when ICE, among other agencies, requests a hold.  SOF ¶ 91.  MCSO has also signed a Basic Ordering Agreement ("BOA") with ICE, which provides that MCSO "shall house detainees pursuant to the issuance and acceptance" of detainers and that ICE will pay $50 per detainer arrest.  SOF ¶ 92.

[13]    The Court has ordered that Defendant is bound by all testimony from MCSO employees regarding MCSO's policy "as though it were taken pursuant to Rule 30(b)(6)." Judge Torres Order (Nov. 20, 2019) (ECF No. 120) at 2–3.  In any event, even absent this kind of ruling, such testimony can establish the existence of a policy. *See, e.g.*, *Holloman ex rel. Holloman v. Harland*, 370 F.3d 1252, 1291, 1294 (11th Cir. 2004) (plaintiff could establish a "policy mandating, authorizing, or permitting" constitutionally prohibited conduct based on "testimony from the teacher charged with implementing School Board policies").

and detained those individuals pursuant to ICE requests and made no efforts whatsoever to investigate those individuals' citizenship. SOF ¶¶ 53, 94–95.

MCSO kept this categorical policy in place despite concrete evidence that the risk of detainers being issued against U.S. citizens was extremely serious. For example, in 2016, MCSO received an email from the Florida Sheriffs' Association attaching a report which noted that "[f]rom 2008 to 2012, ICE erroneously issued more than 800 detainers for U.S. citizens." SOF ¶ 96. And in 2017, MCSO received a letter noting examples of lawsuits by U.S. citizens who were wrongfully held under immigration detainers, including a court's statement that such an "illegal detention revealed a dysfunction of constitutional proportion at both the state and federal levels and a unilateral refusal to take responsibility for the fact that a United States citizen lost her liberty to a baseless immigration detainer through no fault of her own." SOF ¶ 97; Ex. M (Age 30(b)(6) Dep. Ex. 4) (quoting *Morales v. Chadbourne*, 235 F. Supp. 3d 388, 392 (D.R.I. 2017)). Additionally, MCSO received a Florida Sheriffs' Association 2016 Legal Alert which noted a case of a U.S. citizen who was "held because of an immigration detainer mistakenly describing [him] as a suspected 'alien'" until he was released after convincing ICE officials that he was a United States citizen. SOF ¶ 98. Nevertheless, MCSO maintained its categorical compliance with all detainers, regardless of any information suggesting that the individual named in the detainer was a U.S. citizen. SOF ¶ 100; *see* Ex. J (Age 30(b)(6) Dep.) 35:17–21 ("Q. So after receiving the attachment to this email in January 2016 did MCSO establish any policies or practices for addressing claims that the subject of an ICE detainer was a U.S. citizen? A. No.").[14]

The undisputed evidence thus establishes that MCSO's policy, custom, and practice was to unquestioningly comply with all detainers, even where there was an indication that the subject is a U.S. citizen. That policy, custom, and practice subjects MCSO to liability for resulting constitutional violations. *See, e.g.*, *McKusick v. City of Melbourne*, 96 F.3d 478, 484 (11th Cir. 1996) (holding that, where city "could elect not to arrest anyone at all" pursuant to a court injunction, or to arrest only those for whom it had probable cause, a "deliberate policy choice" to instead arrest *all* protestors was "a cognizable policy choice" under *Monell*).

Finally, MCSO's policy, custom, and practice caused the violation at issue here. *See Creedle*, 349 F. Supp. 3d at 1309. There is no dispute that, but for the detainer, Mr. Brown would

---

[14] The Sheriff received all of these documents. SOF ¶ 99.

have been released from MCSO custody and walked free on April 26, 2018. SOF ¶ 36. There is also, as explained, no dispute that MCSO policy directed its officers to comply with the request in the detainer—namely to continue to hold Mr. Brown for ICE. SOF ¶¶ 35, 88. Nor, finally, is there any dispute that MCSO officers' failure to investigate Mr. Brown's assertions of citizenship, or even to call ICE to raise those concerns, likewise flowed directly from MCSO's policy of unquestioningly complying with all detainers, without any investigation, even in cases of asserted U.S. citizenship. SOF ¶¶ 86–88, 108. In other words, MCSO's policy, custom, and practice "was the moving force behind the injury of which the plaintiff complains." *Bd. of Cty. Comm'rs of Bryan Cty., Okl. v. Brown*, 520 U.S. 397, 405 (1997); *see also id.* at 404 ("resolving . . . issues of fault and causation is straightforward" where the plaintiff "claims that a particular municipal action . . . directs an employee" to violate federal law). Defendant is therefore liable under *Monell*. *See Hernandez*, 939 F.3d at 209 (reversing dismissal of *Monell* claim where complaint alleged that city "policy of complying with federal immigration detainers without question, even when circumstances exist to question the validity of the detainer" "caused the deprivation of [plaintiff's] rights"); *Creedle*, 349 F. Supp. 3d at 1309 (holding county liable because "absent the County's independent decision to honor the detainer, [the plaintiff] would not have been re-arrested after posting bond for his original criminal matter").[15]

## II.  Mr. Brown Is Entitled to Summary Judgment on His False Imprisonment Claim.

Mr. Brown is also entitled to summary judgment on Count 2, his false imprisonment claim. "Under Florida law, the tort of false imprisonment is defined as the unlawful restraint of a person

---

[15]   While MCSO's policy, custom, and practice are sufficient to establish liability, MCSO is also liable for its failure to train. A municipality may be liable for inadequate training "where the failure to train amounts to deliberate indifference" to constitutional rights, meaning that "the municipality was on notice" of the need for training and "made a deliberate choice not to take any action." *Ziegler v. Martin Cty. Sch. Dist.*, 831 F.3d 1309, 1326 (11th Cir. 2016) (internal quotation marks omitted). In the face of evidence from MCSO's own database that it had already detained 20 people identified as U.S. citizens in recent years and the various information MCSO received about erroneous ICE detainers across the nation, MCSO was plainly on notice of the pressing need to train its employees regarding the need for investigation when facts arise suggesting that an ICE detainer may have been issued for a U.S. citizen. SOF ¶¶ 94–99. MCSO deliberately ignored that need, never training jail employees (including supervisors) at all on how to address such situations. SOF ¶ 101. For this reason, as well, Defendant is liable for the constitutional violation. *See, e.g.*, *Griffin v. City of Opa-Locka*, 261 F.3d 1295 (11th Cir. 2001) (upholding jury verdict for plaintiff when evidence demonstrating "persistent and widespread failure" to address violations included complaints against City Manager and articles warning of violations).

against his will, the gist of which action is the unlawful detention of the plaintiff and the deprivation of his liberty." *Creedle*, 349 F. Supp. 3d at 1312 (quoting *Johnson v. Barnes & Noble Booksellers, Inc.*, 437 F.3d 1112, 1116 (11th Cir. 2006)) (internal quotation marks omitted).  The elements of Florida false imprisonment are "1) the unlawful detention and deprivation of liberty of a person 2) against that person's will 3) without legal authority or 'color of authority' and 4) which is unreasonable and unwarranted under the circumstances."  *Id.* (quoting *Harder v. Edwards*, 174 So. 3d 524, 530 (Fla. 4th DCA 2015)).

On the first and third elements, as explained *supra* in section I.A, Defendant re-arrested and detained Mr. Brown for ICE pursuant to an immigration detainer that lacked probable cause, thus unlawfully depriving him of liberty.  Arrest and detention without probable cause are unlawful and without legal authority or color of authority.  *See Creedle*, 349 F. Supp. 3d at 1312; *Mathis v. Coats*, 24 So. 3d 1284, 1290 (Fla. 2d DCA 2010) (continued detention after dissipation of probable cause is basis for false imprisonment claim); *cf. Smith v. Thurston*, 2017 WL 2838183, at *6 (S.D. Fla. June 30, 2017) (*Terry* stop lacking reasonable suspicion was "unlawful" and "effected . . . without legal authority" under Florida false imprisonment standard).

On the second element, this detention was clearly against Mr. Brown's will, as the county court had ordered him released, and he repeatedly told Defendant that he was a U.S. citizen who could not be deported.  SOF ¶¶ 39–45, 72–74, 78; *see also Creedle*, 349 F. Supp. 3d at 1312 (allegations of similar facts sufficient to meet "against that person's will" element).

Finally, on the fourth element, Defendant's detention of Mr. Brown for deportation by ICE was unreasonable and unwarranted under the circumstances.  *See Creedle*, 349 F. Supp. 3d at 1312; *Smith*, 2017 WL 2838183, at *6 (*Terry* stop lacking reasonable suspicion was unreasonable and unwarranted even when police are responding to domestic violence 911 call).  Mr. Brown is a U.S. citizen, a fact he raised multiple times, both in person and via written complaints to Defendant's employees.  SOF ¶¶ 39–45, 72–74, 78; *see also Creedle*, 349 F. Supp. 3d at 1312 (allegations of similar facts sufficient to meet "unreasonable and unwarranted" element).  Mr. Brown's pleas were ignored.  SOF ¶¶ 42, 45, 72.  Defendant did not bother to take any number of steps, including performing a simple check of the MCSO computer database, or accepting Mr. Brown's offer to submit his birth certificate, which would have immediately shown that ICE was mistaken.  SOF ¶¶ 39–45, 52–54, 61.  Detention under these circumstances is patently unreasonable and unwarranted.

**III.    Mr. Brown Is Entitled to Summary Judgment on His Declaratory Judgment Claim.**

Pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201, this Court should declare: Whenever MCSO possesses information indicating that an individual in MCSO custody is a U.S. Citizen, including but not limited to the individual's own statements or MCSO records, if:

(1) the individual's U.S. citizenship can be confirmed by records readily accessible to MCSO in the ordinary course of business; or

(2) MCSO has not further investigated the individual's citizenship, including by contacting ICE; or

(3) further investigation by MCSO and/or ICE does not undermine the information indicating that the individual is a U.S. citizen;

any failure by MCSO to release the individual from custody due to an ICE detainer after the individual would otherwise be entitled to release violates the individual's rights under the Fourth Amendment of the U.S. Constitution and Florida tort law.

Declaratory judgment in Mr. Brown's favor is warranted because there is "a substantial continuing controversy between parties having adverse legal interests," *i.e.*, Mr. Brown and MCSO. *A&M Gerber Chiropractic LLC v. GEICO Gen. Ins. Co.*, 925 F.3d 1205, 1210 (11th Cir. 2019) (quoting *Emory v. Peeler*, 756 F.2d 1547, 1552 (11th Cir. 1985)). Mr. Brown has "a reasonable expectation of future injury" of the sort he has already suffered at MCSO's hands. *Id.*

First, Mr. Brown has already been wrongfully detained for immigration purposes twice— once in New Jersey, and once by MCSO. SOF ¶¶ 24, 26, 35. This "prior history" strongly "suggests" that Mr. Brown "is susceptible to being held pursuant to a detainer in the future." *Creedle*, 349 F. Supp. 3d at 1288. Indeed, "U.S. citizens are frequently held pursuant to detainers." *Id.* at 1289.

Second, ICE databases are notoriously error-ridden. *See, e.g.*, *Gonzalez v. Immigration & Customs Enforcement*, No. 12-CV-09012-ABFFMX, 2019 WL 4734579, at *19 (C.D. Cal. Sept. 27, 2019) (finding that ICE violated the Fourth Amendment by relying on an unreliable set of databases to make probable cause determinations for its detainers, because the databases provide outdated information about dynamic facts, are incomplete, and were never intended to be used to make probable cause determinations in the immigration context). That ICE's records are often out of date, and that ICE uses so many different databases that do not necessarily smoothly share data

or updates regarding individuals, *see id.*, increases the risk that ICE will wrongly issue another detainer for Mr. Brown should he be arrested by Defendant in the future.[16]

Third, the danger of being again held pursuant to an ICE detainer is made yet more likely because such holds are "authorized by or part of a government policy"—namely Defendant's policy of unquestioningly honoring all detainers. *Creedle*, 349 F. Supp. 3d at 1287 (quoting *J W ex rel. Tammy Williams v. Birmingham Bd. of Educ.*, 904 F.3d 1248, 1264 (11th Cir. 2018)). If ICE issues another detainer for Mr. Brown in the future, Defendant will once again comply with it and re-arrest Mr. Brown for ICE. SOF ¶ 103.

As long as Mr. Brown remains in Defendant's jurisdiction, he is at risk of being improperly re-arrested by Defendant for ICE. As such, declaratory judgment on his declaratory relief claim is warranted.

## CONCLUSION

For the foregoing reasons, summary judgment as to liability and declaratory relief should be granted to Plaintiff.

Dated:    February 18, 2020

Respectfully submitted,

*/s/ Daniel Tilley*
Daniel Tilley (Fla. Bar No. 102882)
ACLU Foundation of Florida, Inc.
4343 W. Flagler St., Suite 400
Miami, FL 33134
Telephone: (786) 363-2700
dtilley@aclufl.org

Amien Kacou (Fla. Bar No. 44302)
ACLU Foundation of Florida, Inc.
4023 N. Armenia Avenue, Suite 450
Tampa, FL 33607
Telephone: (813) 288-8390
akacou@aclufl.org

---

[16]    Mr. Brown is currently completing a sentence in the custody of Defendant. He anticipates being released from custody sometime this spring and being required to reside in Monroe County while he completes a period of probation.

Spencer E. Amdur*
Cody H. Wofsy*
My Khanh Ngo**
American Civil Liberties Union Foundation
39 Drumm Street
San Francisco, CA 94111
Telephone: (415) 343-1198
samdur@aclu.org
cwofsy@aclu.org
mngo@aclu.org

Omar C. Jadwat*
Lee Gelernt*
American Civil Liberties Union Foundation
125 Broad Street
New York, NY 10004
Telephone: (212) 549-2500
ojadwat@aclu.org
lgelernt@aclu.org

Sarah M. Rich*
Southern Poverty Law Center
150 E. Ponce de Leon Ave., Suite 340
Decatur, GA 30030
Telephone: (404) 521-6700
sarah.rich@splcenter.org

A.J. Hernandez Anderson (Fla. Bar No. 0018092)
Southern Poverty Law Center
P.O. Box 12463
Miami, FL 33101
Telephone: (786) 347-2056
aj.hernandez@splcenter.org

Heather L. Richardson*
Jonathan N. Soleimani*
Jennifer K. Bracht*
Jason S. Kim*
Patrick Hayden*
Andrew C. Bernstein*
Gibson, Dunn & Crutcher LLP
333 South Grand Avenue
Los Angeles, CA 90071
Telephone: (213) 229-7000
hrichardson@gibsondunn.com
jsoleimani@gibsondunn.com
jbracht@gibsondunn.com
phayden@gibsondunn.com
jkim@gibsondunn.com
abernstein@gibsondunn.com

*Admitted pro hac vice*
**Pro hac vice forthcoming*

*Attorneys for Plaintiff*

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that a true and correct copy of the foregoing Plaintiff's Motion for Partial Summary Judgment was served via the U.S. District Court for the Southern District of Florida's electronic filing system on February 18, 2020, on counsel for Defendant Richard A. Ramsay, Bruce Jolly and Harrison Joss.  Service via the Court's electronic filing system is permitted under Federal Rule of Civil Procedure 5(b)(2)(E) and S.D. Fla. Local Rule 5.1(e).

Dated:    February 18, 2020

*/s/ Daniel Tilley*
Daniel Tilley (Fla. Bar No. 102882)
ACLU Foundation of Florida, Inc.
4343 W. Flagler St., Suite 400
Miami, FL 33134
Telephone: (786) 363-2700
dtilley@aclufl.org